**MALT BEVERAGES DISTRIBUTION ASSOCIATION and Tanczos Beverages, Inc., Petitioners**

v.

**PENNSYLVANIA LIQUOR CONTROL BOARD, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 10, 2008.
Decided Feb. 23, 2009.

Robert B. Hoffman, Harrisburg, for petitioner.

Rodrigo J. Diaz, Executive Deputy Chief Counsel, Harrisburg, for respondent.

Robert J. O'Hara, III and Stanley Wolowski, Pittsburgh, for intervenor, Wegman's Food Markets, Inc.

BEFORE: LEADBETTER, President Judge, SMITH–RIBNER, Judge, PELLEGRINI, Judge, FRIEDMAN,

Judge,[1] COHN JUBELIRER, Judge, SIMPSON, Judge, and LEAVITT, Judge.

OPINION BY Judge SIMPSON.

In this appeal from an order of the Pennsylvania Liquor Control Board (PLCB), Malt Beverage Distributors Association (MBDA) and Tanczos Beverages, Inc. (Tanczos) ask whether the PLCB erred in granting Wegmans Food Markets, Inc.'s (Wegmans) application for a restaurant liquor license at its store in Bethlehem, Pennsylvania. Essentially, MBDA argues the real seller of beer here is Wegmans' *supermarket,* and the notion that Wegmans' Market Café restaurant is actually the seller is merely a legal fiction. Wegmans asserts the PLCB erred in granting MBDA and Tanczos standing to intervene in the proceedings. Upon review, we affirm.

## I. Background

In February 2007, Wegmans filed an application for the inter-municipal transfer of Restaurant Liquor License No. R–18314 from Gerstenberg, Inc., 375 East Lawn Road, Upper Nazareth Township, Nazareth, Pennsylvania, to itself, for the premises located at 5000 Wegmans Drive, Hanover Township, Bethlehem, Pennsylvania. MBDA, Tanczos, and Jim–Bob, Inc., filed a joint motion to intervene in the licensure proceedings. Wegmans filed an answer, requesting the PLCB deny the motion to intervene.

The PLCB's Bureau of Licensing (Bureau) informed Wegmans it would conduct a hearing to take evidence regarding several objections by the Bureau, including:

1) The [PLCB] shall take evidence to determine if it should permit an interior connection to the unlicensed grocery store in accordance with Section 3.52(b) of the [PLCB's] Regulations.

2) The [PLCB] shall take evidence to determine whether it should permit [Wegmans] to operate another business on the licensed premises (the storage and preparation of food items for the unlicensed grocery store as well as grocery item sales), in accordance with Section 3.52(c) of the [PLCB's] Regulations.

3) The [PLCB] shall take evidence to determine if [Wegmans] will allow minors to frequent its licensed premises, in violation of Section 493(14) of the Liquor Code.[2]

\* \* \* \*

6) The [PLCB] shall take evidence and hear argument on the issue of whether the Commonwealth Court decision in *Malt Beverage Distributors Association v. Pennsylvania Liquor Control Board,* [918 A.2d 171 (Pa.Cmwlth.), *appeal granted,* 593 Pa. 413, 931 A.2d 626 (2007)], and/or Section 3.52–3.54 of its Regulations, precludes an interior connection between a supermarket and a restaurant, notwithstanding the lack of reference to such a limitation in the Regulation and its predecessors, Regulation 103 and Regulation [R–]37–27 and further notwithstanding the [PLCB's] historical policy of approving such connections when appropriate. *[See] Freedman v. Pennsylvania Liquor Control Board,* 20 Pa. D & C[.]2d 353 (CCP Montgomery 1954). *[See also] Tacony Civic Association v. Pennsylvania Liquor Control Board,* 668 A.2d 584 (Pa. Cmwlth.1995).

7) The [PLCB] shall take evidence and hear argument on the issue of whether

---

1. The decision in this case was reached before January 1, 2009, when Judge Friedman assumed the status of senior judge.

2. Act of April 12, 1951, P.L. 90, *as amended,* 47 P.S. § 4–493(14).

the Commonwealth Court decision in *Malt Beverage Distributors Association v. Pennsylvania Liquor Control Board,* [918 A.2d 171 (Pa.Cmwlth.), *appeal granted,* 593 Pa. 413, 931 A.2d 626 (2007) ], and/or Section 3.52–3.54 of its Regulations, imposes a limitation on the size of the licensed business, notwithstanding the lack of reference to such a limitation in the Regulation and its predecessors, Regulation 103 and Regulation [R–]37–27 and further notwithstanding the [PLCB's] historical interpretation of the Regulations to allow an interior connection to other businesses such as department stores (Wanamaker's and Boscov's).

8) The [PLCB] shall take evidence to determine if [MBDA], [Tanczos] and Jim Bob, Inc., would be directly aggrieved by the granting of this application, which would qualify them as intervenors in this matter. *See In re Application of Family Style Restaurant, Inc.,* 503 Pa. 109, 468 A.2d 1088 (1983); *Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.,* 881 A.2d 37 (Pa.Cmwlth.2005).

9) The [PLCB] shall take evidence to determine that the approval of this application will not adversely affect the health, welfare, peace and morals of the neighborhood within a radius of 500 feet of the proposed licensed premises. . . .

PLCB Op., Finding of Fact (F.F.) No. 2. A hearing ensued before a PLCB hearing examiner.

After hearing,[3] the PLCB hearing examiner issued a recommended opinion in which he opined the PLCB should approve Wegmans' license transfer application. In addition, the hearing examiner opined MBDA and Tanczos would not be directly aggrieved if Wegmans obtained the requested license and, therefore, they should not be granted intervenor status.

The PLCB subsequently issued an order approving Wegmans' license application. The order indicated if an appeal was filed the PLCB would issue an opinion in support of its order. Wegmans filed three motions asking the PLCB to clarify and/or reconsider its order. Each motion focused on the standing of MBDA, Tanczos and Jim–Bob, Inc. to intervene in the proceedings. Ultimately, the PLCB clarified its prior order, holding MBDA and Tanczos had standing and expressly granting them intervenor status.[4] MBDA and Tanczos filed a petition for review to this Court, and the PLCB issued an opinion in support of its order.[5]

---

3. Wegmans also filed license transfer applications for its Williamsport, Wilkes–Barre, Dickson City/Scranton, State College and Easton locations. Within a six-week period, a PLCB hearing examiner conducted individual hearings for each of the various locations. At each hearing the parties presented testimony that was generally applicable to the issues surrounding Wegmans' applications. The parties proceeded before the PLCB hearing examiner by creating a single record applicable to all stores or any single store. However, the PLCB issued separate opinions for each individual location due to some site specific issues as well as specific geographic intervenors.

4. The PLCB declined to grant Jim–Bob, Inc. intervenor status because no one appeared at the hearing on its behalf and, therefore, it failed to show how it would be directly aggrieved.

5. Additionally, MBDA and various distributors filed petitions for review from PLCB orders approving Wegmans' license transfer applications for its stores in Williamsport (513 C.D.2008), Easton (514 C.D.2008), Wilkes–Barre (515 C.D.2008), State College (516 C.D. 2008), and Dickson City/Scranton (518 C.D. 2008). Those matters were argued seriately with this case (Bethlehem, 517 C.D.2008). Like the PLCB, we issue separate opinions for each transfer application.

## II. PLCB's Opinion

### A. PLCB's Findings

The PLCB's opinion in support of its order approving Wegmans' license application contained 458 findings, which are summarized below.

In December 2006, the Hanover Township Board of Supervisors adopted an ordinance approving the transfer of Restaurant Liquor License R–18314 into the Township.

Gregory Banzhoff, a PLCB licensing analyst who investigated Wegmans' inter-municipal license transfer application, testified concerning his investigation of the application and the proposed interior connections. Banzhoff explained the 900 square-foot licensed area would have seating and service accommodations for over 30 patrons at one time. He noted the Wegmans Market Café has numerous specialty food shops on premises, but customers would also be permitted to consume food purchased off the licensed premises. He explained Wegmans would install a four-foot high divider wall separating the licensed restaurant area from the unlicensed grocery store areas. Banzhoff further testified there would be four cash registers used for the purchase of both alcoholic and non-alcoholic beverages in the licensed area, and all beer sales would have to proceed through these registers. He testified the area around the registers currently contains non-alcoholic beverages, but would include coolers for beer if a license is obtained. Banzhoff further testified Wegmans would sell malt or brewed beverages for on and/or off premises consumption.

Banzhoff's investigation also revealed the proposed licensed premises is not located within 200 feet of any other licensed establishment or within 300 feet of any restrictive institutions. He explained the area within a 500–foot radius of the proposed licensed area is approximately 75–percent commercial and 25–percent residential. Banzhoff explained this particular location has a large parking lot which makes up a great deal of the 500–foot radius.

The Bureau also presented evidence that the PLCB previously issued licenses to Boscov's, John Wanamaker's and Wawa, Inc., all of which had restaurants with interior connections to retail stores.

MBDA presented the testimony of Mary Lou Hogan, MBDA's chief counsel and executive secretary. Hogan explained that MBDA is a trade association for malt beverage distributors in Pennsylvania, which is comprised of 430 members. Hogan testified that MBDA's basic concern with regard to Wegmans' application is the economic impact on distributors if a supermarket the size of Wegmans is permitted to sell beer. She testified MBDA believes the difference between Wegmans and a typical restaurant licensee is that customers who patronize Wegmans are there to buy grocery items, which beer distributors cannot sell. She further explained that Wegmans' customers would be able to purchase beer in direct competition with distributors. Hogan testified MBDA is concerned that, because Wegmans sells a multitude of grocery items, the sale of beer at Wegmans could attract customers who might not otherwise be contemplating a beer purchase. Hogan further testified Wegmans would attract customers for take-out beer sales and distributors could not compete with that because distributors are required to sell beer by the case, while restaurants can sell beer in six-packs. Hogan further testified that if Wegmans obtained a restaurant liquor license many of its sales could come at the expense of distributors and, as a result, a number of area distributors would go out of business. Hogan explained the sale of beer by Wegmans would have a direct and indirect

negative impact on all distributors in the state. Specifically, she explained, the direct impact would be for distributors in the immediate area of Wegmans, while the indirect impact would be as a result of other supermarkets across the state obtaining licenses to sell beer.

In addition to Hogan's testimony, Mark Tanczos, a member and area director of MBDA, and president of Tanczos, which holds an importing distributorship license, testified his distributorship is about one mile from Wegmans' Bethlehem location. Tanczos testified that more than 80 percent of the products he sells are malt or brewed beverages. He explained that over the last several years beer sales increased, while the sale of other items such as soda, cigarettes, lottery tickets and cigars decreased because nearby businesses such as grocery stores and gas stations began selling the same products. Tanczos testified if Wegmans is permitted to sell malt and brewed beverages, his business will suffer financially. He testified the competition would be unfair because, while Wegmans can profit from thousands of items, more than 80 percent of his business is from beer sales alone.

Wegmans presented the testimony of David DeMascole, its Regional Beverage Director for Pennsylvania and the general manager of its distribution center in Schuylkill County. As Regional Beverage Manager, DeMascole is responsible for coordinating the opening and introduction of beer sales in the restaurants in Wegmans' stores. DeMascole explained Wegmans began opening restaurants in the 1990s as a way to distinguish itself from other supermarkets and grow its business in the restaurant field. DeMascole explained, compared to large supermarket chains, Wegmans is a small regional chain and it needed to develop a niche, which it did by opening its restaurants over the past 15 years. DeMascole testified the food offered at Wegmans' restaurants is comparable to that served at restaurants such as T.G.I. Friday's or Applebee's, but that Wegmans is at a competitive disadvantage with such restaurants because of its inability to serve a glass of beer with a meal. DeMascole explained that Wegmans would sell beer for both on-site consumption and takeout, but it has not reached a conclusion as to the percentage of on-site consumption versus takeout sales. DeMascole further testified that on-premises consumption of beer would be limited to the licensed areas. DeMascole also testified, unlike its stores in other states, Wegmans does not anticipate impulse purchases of beer in its Pennsylvania stores because the beer would only be located in the restaurant area of the store, which is not an area that all customers frequent.

Wegmans also presented the testimony of Jared Shelly, the store manager of its Bethlehem location, who is familiar with the store layout and all operational aspects. He testified Wegmans' Bethlehem location, which opened in 2001, operates a restaurant under the same roof as the supermarket. Shelly explained customers can access the restaurant directly from an entrance/exit adjacent to the parking lot; thus, customers do not have to walk through any portion of the grocery store to access the restaurant. He explained that if Wegmans' Bethlehem store is granted a liquor license, it would sell beer in individual cans and bottles and six packs; no other alcohol would be sold. He explained Wegmans would sell beer from lockable beer coolers installed along the wall of the restaurant area and that no beer would be sold in any other portion of the store. Shelly testified that if customers wish to consume beer on-site, they would go upstairs to the second floor to do so and the customers could only consume beer if they are also consuming food. Shelly testified

the store is open 24 hours a day, seven days a week and the restaurant is open from 9:00 a.m. to 9:00 p.m., occasionally staying open until 10:00 p.m. He explained Wegmans would sell beer during the hours the restaurant is open, except on Sundays, when beer cannot be sold before noon. He testified that customers 21 years of age and older would be able to choose beer from the coolers, pay for it at a designated registers, put it in a cart and continue to shop for groceries in the store.

Wegmans also presented the testimony of Thomas J. Shepstone, an urban planner, who performed a market study at Wegmans' request. Shepstone testified Wegmans is pursuing its business model of niche marketing, particularly with regard to its sale of prepared foods. Shepstone testified he did not believe there would be a negative impact on any beer distributors if Wegmans began selling beer in its restaurants. He explained that, as compared to other supermarkets, Wegmans is more aptly characterized as a "destination," i.e., a store that customers would travel further to reach than a typical grocery store. Shepstone opined other businesses, including beer distributors, near Wegmans actually benefit from their location because Wegmans draws customers to the area that would not otherwise be there. Shepstone also opined it is unlikely that Wegmans' sale of beer would generate many new customers for Wegmans; rather, the sale of beer would primarily serve existing customers. At Wegmans' request, Shepstone also examined the location of Wegmans' Bethlehem store in relation to Tanczos' distributorship. Shepstone opined Wegmans and Tanczos are located in, and draw customers from, two different neighborhoods resulting in different customer bases. As a result, he opined Wegmans would not detrimentally affect Tanczos' business.

Wegmans also presented the testimony of John Rowland Dunham, an economist, who performed an analysis of whether beer sales by Wegmans would have a significant negative impact on beer distributors. Dunham opined neither MBDA nor any individual distributors would be harmed as a result of Wegmans' beer sales and, in his opinion, they may actually benefit. Dunham testified, in his years of experience studying retail establishments, he found that similar retail establishments often locate together to enhance all of their businesses. Dunham testified Wegmans is beneficial to nearby businesses based in part on the economic benefit of "clustering," which occurs when retail establishments are located very close to one another. Dunham explained the benefit to other distributors of Wegmans being located near them is Wegmans attracts a large number of customers because it is more than a grocery store, but rather it is a "destination retailer." Dunham further testified that sales of cases of beer and six-packs are two different businesses. He opined Wegmans would not adversely impact distributors, in part, because Wegmans would be limited to selling two six-packs per transaction while distributors sell in much greater quantity. Dunham also agreed with Shepstone's testimony that Wegmans would attract few new customers through the sale of beer.[6]

In order to rebut the testimony of Wegmans' experts that more competition helps all businesses, MBDA presented the testimony of Matthew Weinstein, an attorney specializing primarily in retail shopping center development, leasing and financing. He testified that contrary to the testimony of Wegmans' experts, "real world" com-

---

**6.** Wegmans also presented the testimony of its Regional Loss Prevention Manager, Carl Phillips, who testified concerning the safeguards and policies Wegmans would implement in connection with its proposed sale of beer.

mercial tenants do not seek to "cluster" or "co-locate" around similar businesses. To that end, Weinstein testified regarding various use restrictions and restrictive covenants commonly placed in commercial leases that are used to deter direct competition between retail tenants. In addition, MBDA presented the testimony of Lee Goldstein, the owner of several strip malls and the operator of a real estate management company. Goldstein generally agreed with Weinstein's testimony regarding commercial leasing.

## B. PLCB's Analysis

Based on its findings, the PLCB issued an analysis concerning the objections to Wegmans' license transfer application.

As to the issue of standing, the PLCB determined MBDA and Tanczos would be directly aggrieved by the approval of Wegman's license transfer application, and, therefore, they were entitled to intervenor status. The PLCB relied on this Court's decision in *Malt Beverages Distributors Association v. Pennsylvania Liquor Control Board (Sheetz I)*, 881 A.2d 37 (Pa. Cmwlth.2005), *appeal denied*, 586 Pa. 775, 895 A.2d 1264 (2006), where we determined MBDA had standing to intervene in proceedings in which the operator of a Sheetz convenience store sought an "eating place" malt beverage license in order to sell beer for takeout in connection with its "new Sheetz convenience restaurant." *Id.* at 38.

The PLCB also considered whether it should approve an interior connection between the licensed premises and the unlicensed grocery store. It noted that Section 3.52(b) of its regulations provides,

"Licensed premises may not have an inside passage or communication to or with any business conducted by the licensee or other persons *except as approved by the [PLCB]*." 40 Pa.Code § 3.52(b) (emphasis added). The PLCB noted it previously approved interior connections similar to the one at issue here at stores such as Boscov's, John Wanamaker's, and Wawa. The PLCB also determined that, based on evidence regarding the layout of Wegmans' Market Café in relation to the unlicensed grocery store area, there was no reason not to approve the proposed interior connection. It noted the proposed licensed area would be clearly separated from the unlicensed portions of the premises by four-foot high barriers. The PLCB further determined Wegmans' proposal fully complied with the requirements set forth in Sections 3.52–3.54 of the PLCB's regulations, 40 Pa.Code §§ 3.52–3.54. Also, it determined this Court's decision in *Malt Beverages Distributors Ass'n v. Pennsylvania Liquor Control Board (Sheetz II)*, 918 A.2d 171 (Pa.Cmwlth.) (*en banc*) (Simpson, J.), *appeal granted*, 593 Pa. 414, 931 A.2d 626 (2007), did not preclude the proposed interior connection between the licensed premises and the unlicensed grocery store. Finally, the PLCB determined that approval of Wegmans' application would not adversely affect the health, welfare, peace and morals of the neighborhood within a radius of 500 feet of the proposed licensed premises.

Based on these findings and determinations, the PLCB approved the application for double transfer of Restaurant Liquor License No. R–18314.[7] This matter is now before the Court for disposition.[8]

---

7. Shortly after MBDA and Tanczos filed their petition for review with this Court, MBDA filed a motion asking this Court to stay beer sales by Wegmans. Ultimately, a single judge of this Court quashed MBDA's motion.

8. Our review of a decision of the PLCB as an administrative agency is limited to determining whether there was a constitutional violation or an error of law, whether the practices and procedures of the PLCB were followed and whether necessary findings of fact were

## III. Discussion

### A. Standing

■ Wegmans argues the PLCB erred in granting standing to MBDA and Tanczos where: it failed to make a finding that MBDA or Tanczos would be harmed by the grant of the restaurant liquor license; it accepted, but then failed to follow its own hearing examiner's recommended opinion that neither MBDA nor its members would suffer harm if the PLCB approved the license; it misapplied or ignored controlling case law on the standard for intervenor status; and, its decision was tantamount to granting automatic standing to trade associations and licensees in all Liquor Code license application cases. Thus, Wegmans contends, the PLCB's grant of standing to MBDA and Tanczos should be reversed.

MBDA responds the PLCB correctly determined MBDA and Tanczos have standing to intervene in this proceeding and could, therefore, challenge Wegmans' licensure application. MBDA asserts that, in doing so, the PLCB properly adhered to this Court's decision in *Sheetz I,* which is controlling here. MBDA argues the PLCB accurately recognized that MBDA was an appropriate party to participate in proceedings in which substantial issues pertinent to the beer industry were to be decided. Indeed, MBDA contends, it is clearly the case that if MBDA had not challenged Wegman's supermarket/restaurant configuration, no one, including the PLCB, would have. MBDA asserts, although this Court can more fully review the PLCB's standing determination, this Court should affirm that aspect of the PLCB's holding without the need for extended analysis.

For its part, the PLCB argues its decision on standing is consistent with this

supported by substantial evidence in the rec-

Court's holding in *Sheetz I* and, therefore, should be upheld.

■ Granting or denying a petition to intervene is within the sound discretion of the agency involved. *W. Chester Area Sch. Dist. v. Collegium Charter Sch.,* 571 Pa. 503, 812 A.2d 1172 (2002); *Wilkinsburg Educ. Ass'n v. Sch. Dist. of Wilkinsburg,* 690 A.2d 1252 (Pa.Cmwlth.1996). A decision on intervention will not be disturbed unless there has been a manifest abuse of discretion. *Wilkinsburg Educ. Ass'n.*

■ Parties who will be aggrieved by an adverse PLCB decision may petition to intervene in the proceeding pursuant to 40 Pa.Code §§ 17.12–17.13 and may appeal an adverse PLCB decision directly to this Court pursuant to Section 702 of the Administrative Agency Law, 2 Pa.C.S. § 702. *Sheetz I.* To satisfy the requirements of these sections, a party seeking to intervene must demonstrate that it is aggrieved; in other words, it must have a direct and substantial interest in the adjudication and must show a sufficiently close causal relation between the decision and its asserted injury to qualify its interest as immediate. *Id.* In *Unified Sportsmen of Pennsylvania v. Pennsylvania Game Commission,* 903 A.2d 117 (Pa.Cmwlth. 2006), this Court further explained:

> To establish an 'aggrieved' status, a party must have a substantial interest, that is, there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. Also, an interest must be direct, which 'means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains.' Further, the interest must be immediate and not a remote

ord. *Sheetz I.*

consequence of the judgment, a requirement addressing the nature of the causal connection.

An association, as a representative of its members, may have standing to bring a cause of action even in the absence of injury to itself; the association must allege that at least one of its members is suffering immediate or threatened injury as a result of the challenged action.

*Id.* at 122 (citations and quotations omitted).

Of further note, our courts recognize that, on rare occasions outside the disappointed bidder scenario, the injured financial interests of a direct competitor may confer standing. *See, e.g., Application of El Rancho Grande, Inc.,* 496 Pa. 496, 437 A.2d 1150 (1981); *Pa. Ass'n of Independent Ins. Agents v. Foster,* 150 Pa.Cmwlth. 572, 616 A.2d 100 (1992); *Pa. Auto. Ass'n v. State Bd. of Vehicle Mfrs., Dealers & Salespersons,* 121 Pa.Cmwlth. 352, 550 A.2d 1041 (1988).

Here, in determining MBDA and Tanczos had standing to intervene in this matter, the PLCB determined our holding in *Sheetz I* was controlling. Upon review, we discern no error in PLCB's determination that MBDA and Tanczos had standing to intervene in this matter before the PLCB based on our decision in *Sheetz I.*

In *Sheetz I,* Ohio Springs, Inc., an entity related to Sheetz, Inc., applied for the transfer of an eating place malt beverage license from a bar and grill to premises where Sheetz operated a restaurant, convenience store and gas station. MBDA filed a petition to intervene in the licensure proceedings before the PLCB. In support of its petition, MBDA presented the testimony of Hogan, and David Shipula, President of MBDA and the owner of a distributorship, both of whom testified the takeout sale of beer by Sheetz would financially harm MBDA's members. Hogan and Shipula explained that convenience stores that sell beer would have an unfair competitive advantage over distributors and that distributors would lose sales to impulse buyers at Sheetz. Ultimately, the PLCB denied MBDA's petition to intervene. On appeal by MBDA, however, this Court reversed, explaining:

The Court is persuaded that the [PLCB's] denial of MBDA's petition in the present case must be classified as an abuse of discretion and an error of law. First, even under the narrowest interpretation of association standing principles, MBDA presented evidence in the form of the testimony of Hogan and Shipula that retail sales of beer by this Sheetz store will be damaging to any nearby D distributorship[9] because the Sheetz will offer many items that the distributor cannot offer, including food for consumption on the premises, gasoline and convenience store items. If beer for takeout is available as well, it will likely be purchased by customers who went there originally for some other purpose, thereby taking sales from distributors. Hogan testified that the results would likely be catastrophic for a nearby D distributor and that there was such a member distributor [nearby]. An association need only allege that one member is suffering immediate or threatened injury. [*North–Central Pa. Trial Lawyers Ass'n v. Weaver,* 827 A.2d 550 (Pa.Cmwlth.2003).]

More generally, however, the Court also agrees that the [PLCB] should have exercised its discretion to grant standing to MBDA because of the new and very different nature of the application. As

9. D distributors are Pennsylvania beer distributors such as members of MBDA. ID Importing Distributors are distributors who import beer from breweries out-of-state.

MBDA points out, even in *Application of El Rancho Grande*, 496 Pa. at 508, 437 A.2d at 1156, the Supreme Court referred to a statement of the United States Supreme Court in *Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), that where statutes are concerned "the trend is toward enlargement of the class of people who may protest administrative action." In [*MEC Pennsylvania Racing, Inc. v. Pennsylvania State Horse Racing Commission*, 827 A.2d 580 (Pa.Cmwlth. 2003) ], the applicable regulation permitted consideration of the best interests of horse racing generally, and the Horse Racing Commission concluded there that granting the application was in the best interest of racing. The Court stated that MEC had standing akin to that of the "local community" in [*Cashdollar v. State Horse Racing Commission*, 143 Pa.Cmwlth. 650, 600 A.2d 646 (1991)], which had standing to appeal where the statute required consideration of the public interest and the Court held that when an agency was directed in its enabling statute to consider the effects of its decision on a particular class of individuals, then they might have standing to challenge a decision on the ground that the agency did not fulfill its statutory duty.

With 400 beer distributor members, MBDA certainly is integrally involved in the regulated distribution of beer and malt beverages generally. The Liquor Code created the D Distributor Class and to some extent protects that class. A statewide trade association, such as MBDA, is likely much better suited than any individual distributor to represent the interests of the class when a proposal is made that has the potential to alter dramatically the current balance under applicable statutory provisions . . . .

*Sheetz I*, 881 A.2d at 42–43 (footnotes omitted).

Here, as in *Sheetz I*, MBDA presented evidence in the form of testimony from Hogan and Tanczos that the retail sale of beer by Wegmans would financially harm nearby beer distributors. Hogan explained, unlike a typical restaurant licensee, Wegmans offers a large variety of grocery items, which beer distributors cannot offer. As a result, she explained, Wegmans would attract customers who might not otherwise be contemplating a takeout beer purchase, thereby drawing customers away from nearby distributors. Hogan testified she believed a number of beer distributors in the area of Wegmans would go out of business if Wegmans was granted a restaurant liquor license. Additionally, Mark Tanczos, who owns a distributorship about a mile away from Wegmans' Bethlehem location, testified his business would suffer financially if Wegmans is permitted to sell beer for takeout. He explained that Wegmans' ability to sell beer for takeout would draw customers away from his distributorship. Tanczos further testified the competition from Wegmans would be unfair because, while Wegmans can profit from thousands of items, more than 80 percent of his business is from beer sales alone. "An association need only allege that one member is suffering immediate or threatened injury." *Sheetz I*, 881 A.2d at 42.

In short, we believe the above analysis in *Sheetz I* applies with equal force here. As a result, we discern no error in the PLCB's determination that MBDA and Tanczos had standing to intervene in this matter based on *Sheetz I*.

Nevertheless, Wegmans asserts a pair of recent decisions by this Court compels the conclusion that the PLCB erred in determining MBDA and Tanczos had standing to intervene here. *See Capital BlueCross*

*v. Pa. Ins. Dep't,* 937 A.2d 552 (Pa.Cmwlth. 2007) (*en banc*) (Simpson, J.), *appeal denied,* — Pa. —, 963 A.2d 906 (2009); *Pa. Bankers Ass'n v. Pa. Dep't of Banking & Trumark Fin. Credit Union,* 893 A.2d 864 (Pa.Cmwlth.2006) (*en banc*) (Simpson, J.), *rev'd,* 598 Pa. 313, 956 A.2d 956 (2008). For the reasons set forth below, we reject Wegmans' reliance on *Capital BlueCross* and *Pennsylvania Bankers Ass'n.*

Wegmans first relies on an excerpt from *Capital BlueCross* in which this Court stated: "[H]arm will not be presumed. Absent an independent statutory basis for standing, a complaining party must establish a direct interest in an agency action by presenting evidence of causation of harm to its financial interest by the agency action." *Id.* at 591. Wegmans argues that although neither MBDA nor Tanczos presented evidence of causation of harm to their financial interests, the PLCB granted standing. It asserts this decision was erroneous based on the above excerpt from this Court's decision in *Capital BlueCross.*

Contrary to Wegmans' assertions, and as explained more fully above, here MBDA and Tanczos presented evidence of threatened financial harm if Wegmans obtained the requested liquor license and commenced takeout sales of beer. Further, unlike in the case presently before us, in *Capital BlueCross,* the litigants denied intervenor status *did not participate in the agency proceedings* and, therefore, *did not present any evidence* to support their claim that they would suffer financial harm as a result of the challenged agency action. Clearly, that is not the case here. Thus, we reject Wegmans' reliance on *Capital BlueCross.*

Similarly, we reject Wegmans' reliance on *Pennsylvania Bankers Ass'n.* There, banks and a banking association filed petitions to intervene in agency proceedings in which a group of credit unions sought to expand their membership fields. The agency initially granted the banks intervenor status, but later revoked this status and dismissed the banks as intervenors because, at hearing, the banks did not prove their interests would be directly affected by the challenged actions of the credit unions. On appeal, this Court held the agency properly denied the banks' intervenor status because they did not show they would be harmed by the credit unions' proposed expansion, despite an opportunity to do so. Recently, however, our Supreme Court reversed, holding the agency improperly revoked the banks' intervenor status after it failed to give them notice that standing and intervention remained undecided and subject to proof at the agency hearing.

In *Pennsylvania Bankers Ass'n* this Court decided that under some circumstances financial harm may support standing of a competitor to challenge an administrative decision. The standing problem in that case arose from the failure of the competitors, banks and a banking association, to go beyond bare assertions of harm and offer proof of harm during administrative hearings. In contrast, here MBDA and Tanczos offered extensive proof of competitive harm during the administrative hearings. Based on this critical distinction, the holding in *Pennsylvania Bankers Ass'n* does not advance Wegmans' position on standing here.

For these reasons, we discern no error in the PLCB's decision that MBDA and Tanczos had standing to intervene in the licensure proceedings here.

**B. Merits**

 As to the merits, MBDA argues Pennsylvania tightly regulates and restricts the sale of beer and liquor with the goal of restraining, not promoting, their sale. It asserts as part of that policy,

alcohol has always been sold in settings—state stores and beer distributors—that are both specialized and separated. MBDA contends Pennsylvania, unlike some other states, does not allow supermarkets or convenience stores to sell liquor. It argues the PLCB has enforced these principles by prohibiting interconnections between a licensed premises and an adjacent business, subject to limited exceptions. In one of the few reported decisions, the PLCB refused to allow the seemingly innocuous situation of a restaurant licensee sharing space with and accessing a bakery/antique/gift shop. *See Pennsylvania Liquor Control Bd. v. Ripley,* 107 Pa.Cmwlth. 425, 529 A.2d 39 (1987).

MBDA argues that the PLCB's decision, licensing space that is fundamentally an integral part of a supermarket to sell beer primarily for take-out consumption, turns these principles on their head. It asserts Wegmans clearly stated its goal in seeking licensure: it wanted to "make the experience of *shopping at Wegmans* even better, and certainly more convenient, by selling beer in our Market Café restaurant." MBDA contends buying beer "at" the Market Café, is "shopping at Wegmans," part and parcel of Wegmans' "economy of scope" marketing strategy. MBDA asserts it is the sale of beer by and at a supermarket. MBDA maintains it is only by turning a blind eye to reality that the PLCB can view this as a typical restaurant license. It argues many cases in other areas of the law prohibit the exalting of form over substance. *See, e.g., Borough of Youngwood v. Pa. Prevailing Wage Appeals Bd.,* 596 Pa. 603, 947 A.2d 724 (2008).

MBDA asserts the PLCB's action rewrites the Liquor Code rules on the venues at which beer may be sold so that, after 75 years of contrary law and without legislative change, a supermarket—and a large number of big box and other stores that sell prepared food—can now sell beer.

The PLCB responds there is no dispute that Wegmans meets all of the statutory and regulatory requirements necessary to obtain a restaurant liquor license. It further argues there is no dispute that the PLCB can approve an interior connection between a restaurant and another business operated by a licensee. The PLCB contends there is no dispute that for over half a century, the PLCB has in fact approved interior connections between restaurant liquor licenses and supermarkets, grocery stores, bakeries, delis and other businesses. Therefore, the PLCB argues, its decision in this matter should be affirmed.

The PLCB further maintains MBDA's argument that Wegmans' application should be refused because restaurant liquor licenses should not have interior connections to supermarkets has no basis in the Liquor Code, the PLCB's regulations, or the PLCB's past practice. It argues the only authority cited by MBDA in support of its position is *dictum* in this Court's decision in *Sheetz II* and, therefore, it is not precedential. The PLCB further contends it was *dictum* made without the benefit of the issue being briefed by the parties and without the benefit of the PLCB's history on the issue being brought to this Court's attention. It asserts that history clearly establishes the PLCB routinely approved such interior connections for decades. Finally, the PLCB argues, the case relied on by MBDA is currently under review by the Pennsylvania Supreme Court, which stayed the Commonwealth Court's order relied upon by MBDA.

Similarly, Wegmans argues the objections raised by MBDA and Tanczos are meritless. Wegmans contends it presented unrebutted evidence at the PLCB hearing that it qualifies for a restaurant liquor

license. It argues the evidence established Wegmans is a reputable, responsible company and its restaurant facilities far exceed the Liquor Code's requirements. Further, Wegmans maintains, PLCB regulations give the PLCB discretion to approve an interior connection between a licensed premises and another business such as a grocery store. In light of that regulatory authority and the PLCB's long-standing history of approving such connections, the PLCB would have abused its discretion had it not approved the interior connection between the Wegmans' restaurant and the unlicensed Wegmans' grocery store.

At the outset, we note that MBDA and Tanczos do not dispute that Wegmans' Market Café satisfies the statutory "restaurant" definition set forth in Section 102 of the Liquor Code, 47 P.S. § 1–102. *See* Petitioners' Br. at 14–15, n. 12. Section 102 defines a "restaurant" as:

> [A] reputable place operated by responsible persons of good reputation and habitually and principally used for the purpose of providing food for the public, the place to have an area within a building of not less than four hundred square feet, equipped with tables and chairs, including bar seats, accommodating at least thirty persons at one time. The [PLCB] shall, by regulation, set forth what constitutes tables and chairs sufficient to accommodate thirty persons at one time.

*Id.*

Having determined Wegmans' Market Café satisfies the Liquor Code's "restaurant" definition, we next consider whether the PLCB properly approved the proposed interior connection between the Market Café restaurant and the attached grocery store.

To that end, Section 3.52 of the PLCB's regulations states:

> § 3.52. Connection with other businesses.
>
> (a) A licensee may not permit other persons to operate another business on the licensed premises.
>
> (b) Licensed premises may not have an inside passage or communication to or with any business conducted by the licensee or other persons *except as approved by the [PLCB]*.
>
> (c) A licensee may not conduct another business on the licensed premises without [PLCB] approval.

40 Pa.Code § 3.52 (emphasis added).[10]

In addition, Section 3.53 of the PLCB's regulations provides:

> § 3.53. Restriction on storage and sales where [PLCB] has approved connection with other business.
>
> Where the [PLCB] has approved the operation of another business which has an inside passage or communication to or with the licensed premises, *storage and sales of liquor and malt or brewed beverages shall be confined strictly to the premises covered by the license.*

40 Pa.Code § 3.53 (emphasis added).

Further, Section 3.54 of the PLCB's regulations states:

> § 3.54. Separation between licensed premises and other business.
>
> Where the [PLCB] has approved the operation of another business which has an inside passage or communication to or with the licensed premises, *the extent of the licensed area shall be clearly indicated by a permanent partition at least 4 feet in height.*

40 Pa.Code § 3.54 (emphasis added).

Review of a discretionary decision by an administrative agency is limited to a determination of whether there has been an

---

**10.** In its brief Wegmans points out that at no time during these proceedings have MBDA or Tanczos challenged the validity or constitutionality of this regulation.

abuse of discretion. *Slawek v. State Bd. of Med. Educ. & Licensure*, 526 Pa. 316, 586 A.2d 362 (1991). This is a high standard, requiring this Court to abide by the agency's decision absent "bad faith, fraud, capricious action or abuse of power." *Id.* at 321, 586 A.2d at 365. Additionally, "[t]he fact that [a] reviewing court may have a different opinion is not sufficient to interfere with the agency's action and judicial discretion may not be substituted for administrative discretion." *Giant Food Stores, LLC v. Dep't of Health*, 808 A.2d 299, 304 (Pa.Cmwlth.2002).

■ "In construing administrative regulations, the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation...." *Popowsky v. Pa. Pub. Util. Comm'n*, 589 Pa. 605, 629, 910 A.2d 38, 52 (2006); *see also Eagle Envtl. II, L.P. v. Dep't of Envtl. Prot.*, 584 Pa. 494, 884 A.2d 867 (2005).

Here, the PLCB stated (with emphasis added):

[Wegmans] presented evidence concerning the layout of its Market Café restaurant area, which will be licensed, and the unlicensed portion of the premises containing the grocery store. *The proposed licensed area will be clearly marked by four (4)-foot walls and/or painted or marked flooring.* Entrance to the proposed licensed area is possible from an exterior doorway, or interior passageways in the four (4)-foot wall. There will also be interior connections from the proposed licensed kitchen area to an open area of the adjacent grocery store, which will be used only by employees, as well as connections to the deli area, again to be used only by employees. *All beer purchases will be restricted to the licensed portion of the premises, at dedicated cash registers.* The deli and sub cases, beer coolers, and pizza case will form natural barriers between the kitchen and the grocery store. The licensed portion of the premises will have restricted hours, as compared to the rest of the store. Given this evidence, the [PLCB] sees no reason to not approve an interior connection between the proposed licensed premises and the unlicensed grocery store....

*[Wegmans] has made a physical distinction between the proposed licensed area and the rest of the store with regard to employees, payment, location, and other important factors.*

Overall, the [PLCB] feels that sufficient safeguards are in place to permit [Wegmans] to operate another business on the licensed premises, i.e., the storage and preparation of food items for the unlicensed grocery store, without causing any detriment to the welfare or health or safety of persons using the deli areas of the grocery store or persons using the restaurant or other licensed portions of the premises. Thus, the [PLCB] approves the operation of another business on the proposed licensed premises under these circumstances.

PLCB Op. at 116–117, 118–119. No abuse of discretion is apparent in the PLCB's decision to allow the proposed interior connection between the licensed Market Café restaurant area and the unlicensed grocery store.

Moreover, this Court's decision in *Ripley* does not compel a different result. There, the applicants sought a liquor license under the Liquor Code's resort area exception for a restaurant they planned to operate as part of a "bed and breakfast" country inn. The applicants also proposed to operate a bakery and antique/gift shop on the premises. The PLCB denied the application on several grounds, including the proposed licensed premises would have interior connections with other businesses conducted by the applicants. On appeal

by the applicants, the court of common pleas reversed, thereby granting the license. On further appeal by the PLCB, this Court considered, among other things, an issue relating to the applicants' proposal to operate the bakery and antique/gift shop in connection with the bed and breakfast. In resolving this issue, we explained:

The final issue relates to [the][a]pplicants' proposal to operate a bakery and antique/gift shop in conjunction with the country inn. Pertinent regulations provide as follows:

Licensed premises may not have an inside passage or communication to or with any business conducted by the licensee or other persons except as approved by the [PLCB].

40 Pa.Code § 3.52(b). *[The][a]pplicants contend that the antique/gift shop and bakery are, in fact, components of their single business.* We are cognizant, however, of the deference which must be paid to the [PLCB's] interpretation of its own regulations. *We believe it was reasonable for the [PLCB] to conclude that the bakery and antique shop constitute businesses separate from the restaurant which is proposed to be licensed.* As such, the [PLCB] could properly withhold licensing so long as an interior passage connects the businesses. The trial court, therefore, erred in substituting its discretion for that of the [PLCB] on this point.

Since [the][a]pplicants testified that they would be willing, if required, to close any interior passages connecting the bakery and antique/gift shop with the licensed restaurant, we will order that the liquor license be granted subject to that condition as may be further specified by the [PLCB].

*Id.* at 43–44 (emphasis added) (citation omitted).

Unlike in this case, the issue before this Court in *Ripley* was not whether it was appropriate for the PLCB to approve or reject a proposed interior connection such as that sought by Wegmans. Rather, the issue was whether a bakery and antique/gift shop was sufficiently different from a restaurant so as to constitute another business, thereby necessitating PLCB approval. Thus, *Ripley* does not compel the result sought by MBDA and Tanczos here.

Perhaps more importantly, *Ripley* acknowledges the deference afforded to discretionary decisions of the PLCB, such as approving interior connections. Here, the PLCB exercised its discretion in permitting the interior connection because the proposal satisfied the PLCB's regulatory requirements for such an interior connection. No abuse of discretion is apparent in the PLCB's decision.

Finally, our decision in *Sheetz II* does not preclude the PLCB's grant of the restaurant liquor license with the approved interior connection. In *Sheetz II,* we addressed "whether an applicant that proposes to sell malt or brewed beverages solely for takeout," and not for consumption on its premises, meets the definition of a "retail dispenser" in Section 102 of the Liquor Code." *Id.* at 173. Thus, *Sheetz II* focused on the appropriate construction of the statutory "retail dispenser" definition. *Sheetz II* does not address the issue of whether the PLCB could approve an interior connection such as that at issue here.

Judge McGINLEY did not participate in the decision in this case.

### ORDER

AND NOW, this 23rd day of February, 2009, the order of the Pennsylvania Liquor Control Board is **AFFIRMED.**