BENSALEM RACING ASSOCIATION, INC. and Keystone Turf Club, Inc. (d/b/a Philadelphia Park Racetrack), Petitioners

v.

PENNSYLVANIA STATE HARNESS RACING COMMISSION, Respondent.

Commonwealth Court of Pennsylvania.

Argued Feb. 9, 2011.

Decided March 21, 2011.

Kevin J. McKeon, Harrisburg, for Petitioner Bensalem Racing Association, Inc.

Ronald J. Shaffer, Philadelphia, for Intervenor Chester Downs and Marina, LLC.

Jorge M. Augusto, Harrisburg, for Respondent.

BEFORE: LEADBETTER, President Judge, and PELLEGRINI, Judge, and COHN JUBELIRER, Judge, and LEAVITT, Judge, and BROBSON, Judge, and McCULLOUGH, Judge, and BUTLER, Judge.

OPINION BY Judge BROBSON.

These consolidated appeals arise out of a proceeding before Respondent Pennsylvania Harness Racing Commission (Harness Commission) on a petition of Intervenor Chester Downs and Marina, LLC d/b/a Harrah's Chester Casino & Racetrack (Harrah's Chester) for permission to conduct telephone account wagering pursuant to Section 218(b) of the Race Horse Indus-

try Reform Act, Act of December 17, 1981, P.L. 435, *as amended,* 4 P.S. §§ 325.101–.402 (Reform Act). Petitioners Bensalem Racing Association, Inc. and Keystone Turf Club, Inc. jointly d/b/a Philadelphia Park Racetrack (Philadelphia Park) seek to appeal three (3) orders issued by the Harness Commission in that proceeding: (1) a May 27, 2010 Order, which the Harness Commission designated as a "Conditional Approval Order" (First Approval Order); (2) a May 27, 2010 Order denying Philadelphia Park's Petition to Intervene (Intervention Order); and (3) a September 30, 2010 Order, which the Harness Commission designated as the "Final Order" granting approval to Harrah's Chester (Second Approval Order). For the reasons that follow, we reverse as to the Harness Commission's Intervention Order. As a result, we must vacate the First Approval Order and the Second Approval Order and remand for further proceedings.[1]

## I. BACKGROUND

Since April 2003, Harrah's Chester has been duly licensed by the Harness Commission to conduct harness horse racing and pari-mutuel wagering at its facility pursuant to the Reform Act. On or about April 1, 2010, Harrah's Chester filed a verified petition with the Harness Commission, seeking permission to conduct telephone account wagering under Section 218(b) of the Reform Act, which provides, in pertinent part:

Each commission may upon request by any licensed corporation grant permission to the licensed corporation to conduct a telephone account wagering system; provided, however, that all telephone messages to place wagers must be to a place within the race track enclosure: And further provided, That all moneys used to place telephone wagers be on deposit in an amount sufficient to cover the wager at the race track where the account is opened. Each commission may promulgate rules or regulations to regulate telephone account wagering.... All telephone account wagering systems shall be solely operated by the licensed corporations.

4 P.S. § 325.218(b).[2] Harrah's Chester filed an amended petition on or about May 25, 2010. In both its original and amended petition, it proposed an account wagering system (AWS) that it contended complied in all respects with the Reform Act and the Harness Commission's regulations. Part of the proposed system included the use of a third-party contractor.

On April 23, 2010, Philadelphia Park filed its verified petition to intervene with the Harness Commission. The petition included nineteen (19) numbered paragraphs. Philadelphia Park also attached to its intervention petition a proposed "Motion to Dismiss and Answer in Opposition to Account Wagering Petition." On or about May 3, 2010, Harrah's Chester filed a response to the intervention petition. The response had two parts: (1) a preliminary statement in the nature of a general denial, and (2) a paragraph-by-paragraph response. In the paragraph-by-paragraph

1. The Court notes that our review is based on a very thin administrative record. The Commission did not conduct any hearings on Harrah's Chester's petition or Philadelphia Park's petition to intervene. Instead, it appears that, with respect to both requests for relief, the Commission relied exclusively on the contents of written submissions. We thus have similarly focused our view on the written submissions in evaluating Philadelphia Park's challenge to the Intervention Order.

2. "Commissions" is defined in the Act to include the Harness Commission and the State Horse Racing Commission. Section 102 of the Act, 4 P.S. § 325.102.

response, Harrah's Chester *denied* sixteen (16) of the nineteen (19) paragraphs in the intervention petition and *denied as stated* a seventeenth. In all, then, Harrah's Chester purported to admit only the allegations contained in two (2) paragraphs of the intervention petition. (Reproduced Record (R.R.) 26a, 56a–57a.) We can discern, however, some additional, undisputed facts based on further scrutiny of the papers.

Philadelphia Park (*i.e.*, its constituent owners) is licensed by the Harness Commission to conduct harness racing and pari-mutuel waging. It is also approved to conduct telephone account wagering under Section 218(b) of the Reform Act. Philadelphia Park has engaged in each of these licensed and authorized activities at its facility in southeastern Pennsylvania. Harrah's Chester's facility is located within a 35–mile radius of the Philadelphia Park facility. (*Id.* 25a–26a, 56a.) Indeed, Harrah's Chester's primary market area (PMA)[3] and Philadelphia Park's PMA partially overlap. (*Id.* 27a, 59a.) Based on these undisputed facts, neither the parties nor the Harness Commission dispute that Philadelphia Park and Harrah's Chester *are* competitors in harness racing and pari-mutuel gaming and, if the Harness Commission's approval orders stand, *will be* (or even currently are) competitors in telephone account wagering.

In support of intervention, Philadelphia Park relied on its status as a current competitor of Harrah's Chester and a prospective competitor of Harrah's Chester in the area of telephone account wagering. Philadelphia Park's intervention papers express concern over the impact that a new entrant into the telephone account wagering market would have on the existing market—"the grant of Harrah's Chester's application will only serve to cannibalize the existing market." (*Id.* at 27a.) Harrah's Chester denied this assertion. (*Id.* at 58a–59a.) Philadelphia Park also, however, conceded in its intervention papers that it does not have an *exclusive* right to conduct telephone account wagering in its PMA. It nonetheless articulated the following concern:

> While Harrah's Chester may have equal rights to conduct account wagering within the shared portions of the [PMA], [Philadelphia Park] has a direct, substantial and immediate interest in ensuring that such account wagering is conducted in conformance with the requirements and protections, specifically designed for [Philadelphia Park's] benefit, in the Reform Act and Horse and Harness Racing Commission Regulations.

(*Id.* 27a–28a.)[4]

The alleged legal deficiencies in Harrah's Chester's petition for approval of its AWS are more specifically set forth in Philadelphia Park's proposed answer and motion to dismiss the petition for approval (attached as an exhibit to Philadelphia Park's intervention petition):

> Overall, [Philadelphia Park] opposes the relief requested because the account wagering system proposed by Harrah's Chester is violative of numerous requirements of Section 218(b) of the Reform Act. . . . Summarily, in violation of these laws, Harrah's Chester's account wager-

---

3. "The primary market area of a race track, for purposes of this act, is defined as that land area included in a circle drawn with the race track as the center and a radius of 35 air miles." Section 218(e) of the Act, 4 P.S. § 325.218(e).

4. Harrah's Chester denied this assertion as a "legal conclusion[]" to which no response is required. (*Id.* at 59a.)

ing business is to be operated almost entirely by an out-of-state account wagering company which would routinely accept account wagers originating in Pennsylvania, is not solely operated by a licensed corporation, and is not operated exclusively by Harrah's Chester's licensed employees.

(*Id.* at 33a–34a (footnotes omitted).) Philadelphia Park also avers the following:

It is fully admitted that the operation of an account wagering system can be an important tool for a licensed corporation. However, like other business activities, account wagering systems must be conducted in compliance with all applicable laws. Otherwise, illegal account wagering systems will be provided a competitive advantage over an account wagering system, like that operated by [Philadelphia Park], which bears the burden and expense of full legal compliance while Harrah's [Chester] and its contractor cannibalize [Philadelphia Park's] existing business. [Philadelphia Park] in adhering to Pennsylvania law with respect to account wagering currently employs ten people at its racetrack for the account wagering operation. Permitting this Petition will cause an unfair competitive advantage to Harrah's Chester and will cause the loss of jobs at Philadelphia Park.

(*Id.* at 41a–42a.) It further claims:

It is admitted that account wagering systems provide increased exposure to the races wagered on by account wagering patrons. However, this does not excuse the conduct of a system that is not in compliance with applicable laws. As is evident from the petition and its passing-the-buck to a third party contractor, Harrah's Chester intends to reap the benefits of account wagering without making the investment in its facility that is required under the Reform Act and the Commission's regulations and that [Philadelphia Park] and other existing licensed corporations have already made. Such a result is wholly inequitable and plainly inconsistent with the best interests of racing.

(*Id.* at 42a.)

As noted above, the Harness Commission did not conduct any hearing on Philadelphia Park's intervention petition.[5] The Intervention Order provides:

**AND NOW**, this 27th of May, 2010, upon consideration of the Petition to Intervene and Request for Hearing, by Bensalem Racing Association, Inc. and Keystone Club, Inc. (d/b/a Philadelphia Park) and their Motion to Dismiss and Answer to the above Petition for Permission to Conduct an Account Wagering System; and upon consideration of Harrah's Chester's Answer in Opposition to Philadelphia Park's Petition, the Commission, in its discretion, finds *that Philadelphia Park's Petition has failed to demonstrate to the Commission that*

---

**5.** We note that the Harness Commission does not take the position on appeal that, for purposes of ruling on Philadelphia Park's intervention request, it accepted all well-pleaded averments of fact in the intervention petition as true. To the contrary, the Harness Commission explained its approach to the intervention request as follows:

The Commission's Intervention Denial Order *is specifically based upon* a review and assessment of Philadelphia Park's verified pleadings, the allegations contained therein, and the *admitted-to* facts, as filed with the Commission on April 23, 2010. Other than the self-serving conclusions of law contained in Philadelphia Park's Petition to Intervene and its Motion to Dismiss/Answer there is very little *factual evidence* for the Commission to find Philadelphia Park "eligible" to intervene. . . .

(Harness Comm'n Br. at 12 (emphasis added).)

*it has a right to Intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the account wagering provisions of the Race Horse Industry Reform Act.*

In accordance with 1 Pa.Code § 35.28(a)(1–3), Philadelphia Park's Petition to Intervene and accompanying documents is hereby **DENIED.**

(*Id.* at 7a (emphasis added).)

Philadelphia Park argues that it satisfied the requirements for intervention in the proceeding below because the granting of Harrah's Chester's petition would erode unique rights vested in Philadelphia Park by the Reform Act to conduct account wagering within its PMA. Harrah's Chester's entry into account wagering will cause Philadelphia Park financial harm and "cannibalize" its existing customer base. Moreover, as a licensed corporation and as a member of a class the Reform Act seeks to protect, Philadelphia Park has a substantial, direct, and immediate interest in ensuring the Harrah's Chester's entry into account wagering, if permitted, is done in a manner that is consistent with the requirements of law and with the best interests of Pennsylvania horse racing.

The Harness Commission responds that it denied intervention based upon a review of Philadelphia Park's verified pleadings, which contained self-serving conclusions of law and little factual evidence for the Harness Commission to find Philadelphia Park eligible to intervene in Harrah's Chester's petition. The Harness Commission, therefore, determined that Philadelphia Park failed to establish a right to intervention or an interest of such a nature that intervention was necessary or appropriate. In the Harness Commission's view, Philadelphia Park's interests were far too remote and did not support claims of substantial financial interest. Harrah's Chester offers similar reasons to support the Harness Com-

mission's decision to deny Philadelphia Park's intervention petition.

## II. ANALYSIS

### A. *Standard of Review*

■ While an agency has considerable discretion to grant or deny a petition to intervene, such decisions remain subject to review of this Court and will be reversed where the agency's decision constitutes an error of law or an abuse of discretion. *Malt Beverages Distribs. Ass'n v. Pa. Liquor Control Bd.,* 881 A.2d 37, 42 (Pa. Cmwlth.2005) (*Sheetz I* ), *appeal denied,* 586 Pa. 775, 895 A.2d 1264 (2006). An agency's decision on intervention will not be disturbed absent a manifest abuse of discretion. *West Chester Area Sch. Dist. v. Collegium Charter Sch.,* 571 Pa. 503, 812 A.2d 1172 (2002); *Browning–Ferris, Inc. v. Dep't of Envtl. Res.,* 143 Pa.Cmwlth. 251, 598 A.2d 1061 (1991). An abuse of discretion is not merely an error in judgment. *Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n,* 592 Pa. 475, 926 A.2d 908 (2007). Rather, discretion is abused where the law is overridden or misapplied, or the judgment exercised is clearly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record. *Id.*

### B. *Intervention Generally*

■ Intervention in a proceeding under the Reform Act is governed by Sections 35.27 through 35.32 of the General Rules of Administrative Practice and Procedure (GRAPP), 1 Pa.Code §§ 35.27–.32. *Pittsburgh Palisades Park, LLC v. Pa. State Horse Racing Comm'n,* 844 A.2d 62, 65 (Pa.Cmwlth.) (en banc), *appeal denied,* 581 Pa. 702, 864 A.2d 1206 (2004). Request to intervene in an administrative proceeding is by petition. 1 Pa.Code § 35.27(2).

With respect to who is eligible to intervene, Section 35.28 provides:

(a) *Persons.* A petition to intervene may be filed by a person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the statute under which the proceeding is brought. The right or interest may be one of the following:

(1) A right conferred by statute of the United States or of this Commonwealth.

(2) An interest which may be directly affected and which is not adequately represented by existing parties, and as to which petitioners may be bound by the action of the agency in the proceeding. The following may have an interest: consumers, customers or other patrons served by the applicant or respondent; holders of securities of the applicant or respondent; employes of the applicant or respondent; competitors of the applicant or respondent.

(3) Other interest of such nature that participation of the petitioner may be in the public interest.

(b) *Commonwealth.* The Commonwealth or an officer or agency thereof may intervene as of right in a proceeding subject to this part.

1 Pa.Code § 35.28. While Section 35.28 of GRAPP establishes criteria for a third party's *eligibility* to intervene in a proceeding before an administrative agency, that section does not *require* the agency to grant intervention. *Pa. Dental Assoc. v. Ins. Dep't,* 122 Pa.Cmwlth. 241, 551 A.2d 1148, 1151 (1988); *see also Keystone Redevelopment Partners, LLC v. Gaming Control Bd.,* 5 A.3d 448, 460–61 (Pa.Cmwlth. 2010) ("[E]ven if [petitioner] satisfied all the criteria set forth in the regulation, the Board would not be compelled to permit

intervention. Rather, the Board's decision on intervention is an exercise of discretion, the review of which is deferential."). Instead, the agency may exercise its discretion to deny intervention even if the eligibility criteria of Section 35.28 are satisfied.

Eligible persons seek intervention to influence the outcome of a particular administrative agency proceeding. Those who seek to appeal an agency adjudication to this Court, by contrast, wish to undo that outcome. This is an important distinction and one that is obvious when comparing the eligibility requirements for intervention above and the test for standing to appeal. Section 702 of the Administrative Agency Law (AAL), which authorizes appeals from Commonwealth agency adjudications, provides:

Any person *aggrieved* by an adjudication of a Commonwealth agency who has a *direct interest* in such adjudication shall have the right to appeal therefrom to the court vested with jurisdiction of such appeals by or pursuant to Title 42 (relating to judiciary and judicial procedure).

2 Pa.C.S. § 702 (emphasis added). In *Citizens Against Gambling Subsidies, Inc. v. Pennsylvania Gaming Control Board,* 591 Pa. 312, 318–19, 916 A.2d 624, 628 (2007) (per curiam), our Supreme Court succinctly, but comprehensively, set forth the test for standing in administrative agency appeals:

Standing to appeal generally requires both status as a party and aggrievement. The rights and liabilities of a party to an action may be attained, where appropriate, through intervention in the tribunal having original jurisdiction. The traditional test for aggrievement entails demonstration of a direct, immediate, and substantial interest. The purpose of this requirement is to guard against improper litigants by re-

quiring some proof of an interest in the outcome that surpasses the common interest of all citizens.

As Petitioners highlight, by virtue of Section 702 of the Administrative Agency Law, neither party status nor traditional aggrievement is necessary to challenge actions of an administrative agency. Rather, standing to appeal administrative decisions extends to "persons," including non-parties, who have a "direct interest" in the subject matter, as distinguished from a "direct, immediate, and substantial" interest. A direct interest requires a showing that the matter complained of caused harm to the person's interest. Although not the full equivalent of "direct, immediate, and substantial," the direct interest requirement retains the function of differentiating material interests that are discrete to some person or limited class of persons from more diffuse ones that are common among the citizenry.

(Citations omitted) (emphasis added); see also Soc'y Hill Civic Ass'n v. Pa. Gaming Control Bd., 593 Pa. 1, 928 A.2d 175 (2007) (applying Court's analysis in Citizens ).

 Like Section 702 of the AAL, Section 35.28(a)(2) of GRAPP provides that a person seeking intervention must have "[a]n interest which may be directly affected." It does not require demonstration of a "direct, immediate, and substantial" interest—which our Supreme Court characterized in Citizens as the "traditional" test for standing. It is also not necessary for an entity seeking intervention in an administrative proceeding to show that it is suffering present "harm" or will de-

finitively suffer harm in the future. This is obvious not only from the use of the words "may be directly affected" in Section 35.28(a)(2), but also because actual harm, if any, can only be determined after the agency issues its adjudication. It is at that point that a party or nonparty wishing to appeal the agency adjudication under Section 702 of the AAL must be prepared to show that the adjudication caused harm to the person's interests—i.e., that the person has "standing" to appeal.[6]

We have before seen this interaction between intervention and standing to appeal in the context of a company that seeks to challenge a competitor's request for favorable administrative agency action. In MEC Pennsylvania Racing, Inc. v. Pennsylvania State Horse Racing Commission, 827 A.2d 580 (Pa.Cmwlth.2003), Penn National and MEC, licensees of the Pennsylvania State Horse Racing Commission (Horse Commission), appealed an order of the Horse Commission, granting a license to Presque Isle to conduct horse racing meetings and pari-mutuel wagering. Despite repeated requests by MEC, the Horse Commission did not hold a formal hearing (i.e., a hearing that complies with the AAL) on the Presque Isle application. Instead, it held an open meeting to the public, without any right of cross-examination. It also accepted written submissions from the public. It issued its final order approving the application on November 19, 2002.

Presque Isle moved to quash the appeals, raising two issues for our review. The first was whether the Horse Commis-

---

**6.** We explained this limited overlap between intervention under GRAPP and standing to appeal under Section 702 of the AAL in Pennsylvania Association of Independent Insurance Agents v. Foster, 150 Pa.Cmwlth. 572, 616 A.2d 100 (1992) (PAIIA ). There we noted that while a party's intervenor status before an administrative agency is a factor this Court will consider when determining whether the intervenor has standing to appeal under Section 702 of the AAL, intervenor status is not alone sufficient to confer standing to appeal "where other factors weigh against it." PAIIA, 616 A.2d at 103.

sion's Order under the Reform Act was an appealable order. We held that the Horse Commission's order approving Presque Isle's license application met the definition of an "adjudication" under the AAL and thus was an appealable order. *MEC*, 827 A.2d at 587–88. The second issue was whether, assuming the order was appealable, MEC and Penn National had standing to appeal under Section 702 of the AAL. Without the benefit of our Supreme Court's articulation in *Citizens* of the difference between standing to appeal under Section 702 and standing to appeal generally, in *MEC* we applied the "traditional standing test." *Id.* at 588.

We held that Penn National had a direct, substantial, and immediate interest in the Horse Commission's decision because both the Horse Commission and Presque Isle acknowledged that a grant of Presque Isle's application would cause pecuniary harm to Penn National's interest. Accordingly, we held that Penn National had standing to appeal. *Id.* at 589. We also held that MEC had standing to appeal:

> MEC also has standing because it demonstrated that the development of a new live racetrack in Erie would result in a direct dilution of attendance and revenue at its own racetracks, as well as adversely impact the racing industry as a whole, including an overall decline in the horse supply for the Mid–Atlantic region. The loss of attendance and revenue will harm a direct, substantial and immediate interest of MEC's. Moreover, in its decision, the Commission extensively discussed why, under 58 Pa.Code § 165.18, the Presque Isle Application was in the "best interest of horse racing." It follows from this discussion that MEC, which makes up approximately one-third of all OTW facilities and one-half of all live racing facilities in the Commonwealth, has standing, like the "local community" in *Cashdollar*,[7] to appeal. Because of MEC's undeniable involvement with horse racing, it clearly has a direct interest in any license adjudication affecting those interests in the Commonwealth.

*Id.* at 589–90 (footnotes omitted).

Having established that (a) the AAL applied to the Horse Commission's licensing decision and (b) both Penn National and MEC satisfied the traditional test for standing to appeal, we next addressed Penn National's and MEC's contention that, under the AAL, they were entitled to a formal hearing on Presque Isle's application, with a right of cross-examination.[8]

---

**7.** In *Cashdollar v. State Horse Racing Commission*, 143 Pa.Cmwlth. 650, 600 A.2d 646 (1991), this Court held that residents in a local community had standing to challenge the Horse Commission's licensing decision for failure on the part of the Horse Commission to consider the impact that decision would have on the local community—a factor that, under the Reform Act, the Horse Commission must consider. In *MEC*, we succinctly summarized the legal principle that can be drawn from *Cashdollar:*

> [W]here an administrative agency was directed by its enabling statute to take into consideration the effect of its decision upon a particular class of individuals, then those individuals might have standing to challenge the agency's decision on the basis that it did not fulfill its statutory duty.

*MEC*, 827 A.2d at 589.

**8.** Section 504 of the AAL, 2 Pa.C.S. § 504, provides:

> No adjudication of a Commonwealth agency shall be valid as to any party unless he shall have been afforded reasonable notice of a hearing and an opportunity to be heard. All testimony shall be stenographically recorded and a full and complete record shall be kept of the proceeding.

Section 505 of the AAL, 2 Pa.C.S. § 505, provides: "Reasonable examination and cross-examination shall be permitted." *Id.* § 505.

In answering this question, we looked to the definition of "party" in the AAL, which provides: "Any person who appears in a proceeding before an agency *who has a direct interest in the subject matter of such proceeding.*" Section 101 of the AAL, 2 Pa.C.S. § 101 (emphasis added). Applying this definition, we reasoned that because Penn National's and MEC's interests were direct enough to satisfy the traditional standing test to appeal the Horse Commission's Order, "it follows that they also have a 'direct interest in the subject matter' of the proceeding entitling them, as a 'party' to a formal hearing, with cross-examination." *MEC*, 827 A.2d at 590. We held, however, that only MEC made a formal request for a hearing below. We thus vacated the Horse Commission's Order and remanded for formal hearings under the AAL with MEC (but not Penn National) as a party.

On remand, MEC waived a hearing and, effectively, withdrew its opposition to the Presque Isle application. By that time, however, a new entity—Pittsburgh Palisades Park, LLC (Palisades)—had entered the fray. It filed an application for a thoroughbred racing license and sought to intervene in the Presque Isle proceeding before the Horse Commission on remand. The Horse Commission denied the intervention request and reinstated Presque Isle's license. Palisades appealed to this Court. *Pittsburgh Palisades Park, LLC*, 844 A.2d at 64–65.

Unlike in *MEC*, the issue before the Court in *Palisades* was not standing to appeal. Rather, like the case presently before us, the issue before the Court in *Palisades* was purely a question of whether the Horse Commission abused its discretion in denying Palisades' request to intervene. The Court thus focused its analysis on Section 35.28(a) of GRAPP and the three circumstances under which a

person would be eligible to intervene in an administrative agency proceeding under that section. Applying the abuse of discretion standard, we held that Palisades "fails to satisfy any of these requirements so clearly as to compel intervention contrary to the Commission's exercise of discretion." *Id.* at 65–66.

We reasoned that Palisades did not meet the first eligibility category for intervention—*i.e.* a right conferred by statute—because the Reform Act did not provide any person with a statutory right to intervene. *Id.* With respect to the second eligibility category, we opined that Palisades was not "directly affected" by the reinstatement of Presque Isle's license. We noted specifically that Palisades was not a licensed entity and, thus, was not a "competitor" of Presque Isle. We also noted that Palisades did not purport to fall within any other of the classes of persons identified in Section 25.28(a)(2) of GRAPP. We found it persuasive that Palisades did not object to or participate in the initial proceedings before the Horse Commission on Presque Isle's license application. We further reasoned:

> Palisades is not bound by the Commission's decision because it possesses no right or obligations as a result of the reinstatement of the license to Presque Isle. Further, any interest [Palisades] may have as one of many applicants for a future license is too speculative to compel intervention as of right.

*Id.* at 66. Finally, we rejected Palisades' argument that intervention was in the public interest:

> Third, ... Palisades' interest in the Presque Isle license is not sufficient to compel intervention "in the public interest." On this issue, Pittsburgh Palisades contends it defends the public's interest in open, honest government, subject to the rule of law rather than to

caprice or favoritism. What these noble contentions ignore is the public interest in finality. Presque Isle's initial application was submitted in June, 2001. There followed 16 months of noticed public meetings and written submissions involving 25 entities, including current license holders, industry associations and elected officials. As none of the participants in those extensive proceedings assigns error or seeks enlargement of the record, the public's interest in finality preponderates against purifying the process by reinitiating with a new party.

*Id.* (citation omitted).

In *Sheetz I,* the Pennsylvania Liquor Control Board (LCB), like the Harness Commission in this case, simultaneously issued its decision on the merits of an application to transfer an eating place malt beverage license to a convenience store (Sheetz) and on the intervention request of the Malt Beverages Distribution Association (MBDA).[9] But unlike the Harness Commission, the LCB held a hearing to address both the merits of the transfer application and whether MBDA "would be directly aggrieved" if the LCB granted the transfer application. The LCB approved the transfer, but denied intervention to MBDA. MBDA appealed.[10]

On appeal, we applied the traditional test for standing to determine whether the LCB erred in denying intervention to MBDA. We noted that the record clearly established that retail sales at any distributor near the proposed transferee would be damaged by the transfer because Sheetz offers a range of products that a distributor cannot offer (*e.g.,* food, gas, and other convenience store items). *Sheetz I,* 881 A.2d at 42. Indeed, the record testimony was that the loss of business would be catastrophic to a competing distributor. *Id.* We determined that this established interest was sufficient under "even the narrowest interpretation of association standing principles," and, consequently, that the LCB erred in not granting the intervention petition. *Id.; see MEC,* 827 A.2d at 590 (entity that establishes standing under traditional standing principles has interest direct enough for intervention under GRAPP). Alternatively, we held that because the Liquor Code created the distributors in question and, to a certain extent, protects that class, "[a] statewide trade association, such as MBDA, is likely much better suited to represent the interests of the class when a proposal is made that has the potential to alter dramatically the current balance under applicable statutory proceedings." *Sheetz I,* 881 A.2d at 43.[11]

In *Capital BlueCross v. Pennsylvania Insurance Department,* 937 A.2d 552 (Pa. Cmwlth.2007) (en banc), *appeal denied,* 600 Pa. 106, 963 A.2d 906 (2009), the Court again addressed the issue of a competitor's standing to appeal. Capital BlueCross (CBC) filed a petition for review with this Court, seeking to challenge an adjudication of the Pennsylvania Insurance Commissioner (Commissioner) favorable to one of CBC's competitors—Highmark Inc. (High-

---

9. MBDA is a Pennsylvania association of beer distributors. *Sheetz I,* 881 A.2d at 39.

10. We note that the rules governing intervention in LCB proceedings are different from those set forth in GRAPP. *See* 40 Pa.Code § 17.12. Nonetheless, they are sufficiently similar for purposes of our analysis.

11. In a subsequent appeal from a separate but similar LCB adjudication, we upheld the LCB's decision to grant intervention to MBDA, based on LCB's adherence to our decision in *Sheetz I. Malt Beverages Distrib. Ass'n v. Pa. Liquor Control Bd.,* 965 A.2d 1254 (Pa.Cmwlth.2009) (en banc), *aff'd,* — Pa. ——, 8 A.3d 885 (2010).

mark). But unlike the competitors in *MEC*, CBC made no effort to intervene or to otherwise participate in proceedings before the Commissioner that led to the adjudication in question. Highmark moved to quash CBC's appeal for lack of standing based, in part, on CBC's failure to participate in the administrative proceeding that led to the adjudication. Relying on Section 702 of the AAL, CBC argued that it was not required to be a party below in order to appeal the adjudication. Moreover, it cited several cases from this Court and the Pennsylvania Supreme Court, recognizing that competitive injury of a direct competitor may confer standing. *See In re Application of El Rancho Grande, Inc.*, 496 Pa. 496, 437 A.2d 1150 (1981); *PAIIA; Pa. Auto. Ass'n v. State Bd. of Vehicle Mfrs., Dealers and Salespersons*, 121 Pa.Cmwlth. 352, 550 A.2d 1041 (1988).[12]

Unlike the Court in *MEC*, the Court in *Capital BlueCross* had the benefit of the Pennsylvania Supreme Court's guidance in *Citizens* and *Society Hill*. We examined the Supreme Court's decision in *Citizens* and the various decisions regarding competitor standing. Based on that examination, we concluded that CBC's failure to participate in the administrative proceeding and its failure to present in that proceeding evidence of harm to its interests

barred the company from appealing the adjudication to this Court:

> In sum, absent an independent statutory basis for standing, a litigant asserting competitor standing to appeal an agency action must establish a direct interest in it by presenting evidence of causation of harm to its financial interest by the agency action.

*Capital BlueCross*, 937 A.2d at 593 (citation omitted). Though CBC argued that any attempt to participate in the administrative agency proceedings would have been futile, we rejected the argument:

> This argument would be more persuasive if Capital had attempted to intervene and was prevented from doing so; however, Capital made no effort at all to intervene or even participate at some more modest status.

*Id.*[13]

### C. *Philadelphia Park's Intervention*

 In assessing whether the Harness Commission abused its discretion in denying Philadelphia Park's intervention request, we first note that the only reason the Harness Commission gave in its Intervention Order for denying intervention was its finding that Philadelphia Park's intervention petition "failed to demonstrate to the Commission that [Philadelphia Park] has a right to Intervene or an

---

**12.** These cases also appear in the parties' briefs in this appeal.

**13.** This lack of participation in administrative proceedings below was a significant factor in our recent decision in *Keystone Redevelopment Partners*. In that case, we affirmed the Pennsylvania Gaming Control Board's (Board) decision to deny intervention in a proceeding on a petition by a licensee for an extension of time to commence operation. Keystone Redevelopment Partners, LLC (Keystone), the party appealing the intervention order, was an unsuccessful applicant before the Board who did not appeal the denial of its application and grant of licensee's applica-

tion. Nonetheless, it sought to intervene three years later in the Board's proceedings on the licensee's request for an extension of time to commence operations. In affirming the Board's decision, we found persuasive the Board's findings that Keystone did not appeal the original licensing proceedings and that it was not currently a licensee and, therefore, could not be considered a competitor for purposes of intervention. Based on these and other findings by the Board, we held that the Board did not abuse its discretion in denying intervention. *Keystone Redevelopment Partners*, 5 A.3d at 460–64.

interest of such a nature that intervention is necessary or appropriate to the administration of the account wagering provisions of the [Reform Act]." (R.R. 7a.) In other words, the Harness Commission found that Philadelphia Park was not eligible to intervene under Section 35.28(a) of GRAPP. Our review of the intervention papers and the case law persuades us that the Harness Commission's denial of Philadelphia Park's intervention request on this ground was an abuse of discretion.

Philadelphia Park falls squarely within the class of persons eligible to intervene under Section 35.28(a)(2).[14] It is undisputed that Philadelphia Park is currently a licensee of the Harness Commission in the same geographic market (overlapping PMA) as Harrah's Chester. At the time it sought intervention below, Philadelphia Park was an *existing* competitor of Harrah's Chester in harness racing and parimutuel wagering. Moreover, at the time Philadelphia Park sought intervention, it was a certainty that a favorable ruling by the Harness Commission on Harrah's Chester's application would make Philadelphia Park a competitor of Harrah's Chester in telephone account wagering. These undisputed facts alone compel the conclusion that Philadelphia Park's interest in the outcome of the administrative proceeding below was far greater than the interests of the would-be intervenors in *Palisades* and *Keystone Redevelopment Partners.*

Both the Harness Commission and Harrah's Chester argue that Philadelphia Park's only alleged interest is that of a competitor seeking to preserve its current position as the principal or only licensee in its geographic market authorized to conduct telephone account wagering. They claim that an interest in limiting competition alone is not an interest sufficient to confer standing under GRAPP. We simply cannot find support for this position in Philadelphia Park's intervention papers.

It is true that the Reform Act clearly contemplates that licensees' PMAs may overlap. The Reform Act, however, also provides protection to these competing licensees: "[I]f two tracks share primary market area as defined herein, both tracks shall have *equal rights* to the market in the shared area." Section 218(d) of the Reform Act, 4 P.S. § 325.218(d) (emphasis added). In its intervention petition, Philadelphia Park clearly articulated its concern that approval of Harrah's Chester's AWS would run contrary to the notion of "equal" competition embodied by this provision in the Reform Act:

> While Harrah's Chester may have equal rights to conduct account wagering within the shared portions of the [PMA], [Philadelphia Park] has a direct, substantial and immediate interest in ensuring that such account wagering is conducted in conformance with the requirements and protections, specifically designed for [Philadelphia Park's] benefit, in the Reform Act and Horse and Harness Racing Commission Regulations.

(R.R. 27a–28a.) Philadelphia Park's primary contention on the merits of Harrah's Chester's petition for approval of its AWS is that the system, as proposed, does not comply with the requirements of Section 218 of the Reform Act or the Harness Commission's telephone account wagering regulations (58 Pa.Code §§ 187.1–.4). Philadelphia Park contends, and we agree, that subsumed within the notion of equal

---

**14.** Because it is so clear to this Court that Philadelphia Park is eligible to intervene under Section 35.28(a)(2), we do not address the parties' arguments regarding eligibility under (a)(1) or (a)(3).

competition are fair and lawful competition. Philadelphia Park articulates fair and reasonable concerns in this regard. As a licensee, it claims that it has complied with the Reform Law and regulations with respect to its telephone account wagering system at some expense in terms of investment in facility improvements and human resources. If, as Philadelphia Park contends, Harrah's Chester's AWS does not comply with the Reform Law and regulations and this noncompliance would provide Harrah's Chester with an unfair, unequal competitive advantage, this is a harm that Philadelphia Park should have a fair and reasonable opportunity to prevent in proceedings before the Harness Commission.

In light of the foregoing, Philadelphia Park, as an existing and prospective competitor of Harrah's Chester, has a clear interest in Harrah's Chester's application for approval of its AWS under the Reform Act. This interest goes beyond a mere pecuniary interest in preserving its market position; rather, it is an interest in equal competition for business expressly recognized in the Reform Act. And this interest alone provides a sufficient basis to establish eligibility to intervene under Section 35.28(a)(2).[15]

■ We also note that a competitor's pecuniary interest in the outcome of an administrative proceeding can support intervention. *See MEC; Sheetz I; Capital BlueCross.* In its intervention papers,

Philadelphia Park articulates a pecuniary interest in the Harness Commission's decision on par with the interest we recognized in *MEC—i.e.,* concern over the dilution of its telephone account wagering business and revenue by the introduction of a competitor into the market. Harrah's Chester, in its response, "acknowledge[ed] that its introduction of account wagering could dilute [Philadelphia Park's] own account wagering business." (R.R. at 58a.) We believe that this stated concern over pecuniary harm and Harrah's Chester's candid concession were sufficient to establish eligibility to intervene under Section 35.28(a)(2) of GRAPP and this Court's precedent.

The Harness Commission and Harrah's Chester characterize all of Philadelphia Park's claims in support of intervention as merely concerns about "future" harm that is too remote and speculative to support intervention. But in making this argument, the Harness Commission and Harrah's Chester would improperly hold Philadelphia Park to a traditional standing test to establish eligibility to intervene under GRAPP. While our decisions in *MEC* and *Sheetz I* reasoned that an entity that can satisfy the traditional standing test should have been allowed to intervene in the administrative proceeding below, those decision reflect only what our Supreme Court later acknowledged in *Citizens* and *Society Hill—i.e.,* that the traditional standing test is a more onerous test than what a litigant must prove to appeal an administrative agency adjudication under Section 702 of

---

**15.** Harrah's Chester argues in its brief that even if Philadelphia Park satisfies the direct interest prong of Section 35.28(a)(2) of GRAPP, it does not satisfy the other prongs of that section—(1) that Philadelphia Park's interests are not adequately represented by existing parties, and (b) that Philadelphia Park would be bound by the Harness Commission's decision on Harrah's Chester's AWS petition. We disagree. In our review of the sparse record on appeal, the only "existing parties" below were the Harness Commission (the adjudicator) and Harrah's Chester (the application/petitioner), neither of which could be described as representing Philadelphia Park's interests. It is also clear that any decision of the Harness Commission approving Harrah's Chester's AWS would be binding on Philadelphia Park, an existing licensee operating a telephone account wagering system in the same geographic market as Harrah's Chester's proposed AWS.

the AAL. It is also a more onerous than what a person must show to be eligible to intervene under Section 35.28(a)(2) of GRAPP. *See PAIIA*, 616 A.2d at 103; *MEC*.

As noted above, intervention under GRAPP is sought *before* final administrative action is taken. Thus, whether a particular agency action *will*, with certainty, cause a direct, immediate, and substantial harm to a would-be intervenor's interest is not and cannot be the test for intervention. That is why Section 35.28(a)(2) of GRAPP appropriately provides that a person who has "[a]n interest which *may be* directly affected" can seek to intervene in an administrative proceeding. (Emphasis added.) If "proof" of actual harm is what the Harness Commission believed was required for purposes of its intervention decision, the Harness Commission, like the LCB in *Sheetz I*, should have conducted a hearing and taken evidence on the question of whether Philadelphia Park could actually prove the harm it alleged in its papers.[16] It did not. Instead, it chose to resolve the intervention request on the papers alone. Our review of those papers and the case law compels us to conclude that the Harness Commission applied the wrong legal standard in evaluating Philadelphia Park's intervention request.

### D. *Remaining Issues*

The Court consolidated these matters by Order of January 14, 2011, wherein the Court also granted Philadelphia Park's request to appeal the Second Approval Order *nunc pro tunc*. Harrah's Chester and the Harness Commission moved the Court for reconsideration of the portion of the January 14, 2011 Order granting the *nunc pro tunc* appeal, and the Harness Commission filed its own motion to quash the appeal of the Second Approval Order as untimely. By per curiam Order, we notified the parties that the requests for reconsideration and motion to quash would be decided with the merits. In addition, Philadelphia Park argues in its brief that we should quash the appeal of the First Approval Order for lack of standing.

All of these requests for relief are addressed to Philadelphia Park's appeals of the so-called "merits" determinations—*i.e.*, the approval orders. We have, however, focused on the validity of the underlying administrative proceeding, not the wisdom of the result. Neither the Harness Commission nor Harrah's Chester argues that this Court does not have jurisdiction to review the Intervention Order or that Philadelphia Park lacks standing to appeal the Intervention Order. In the absence of any argument to the contrary, we are satisfied that Philadelphia Park's appeal of the Intervention Order is properly before us.[17]

For the reasons set forth above, the Harness Commission abused its discretion

---

16. Indeed, our decision in *Capital BlueCross* strongly suggests that a competitor who participates in a proceeding before an administrative agency should create a record as to the competitor's alleged interest and how its interest would be adversely affected. This record would then be available to this Court for review if the competitor's standing later becomes an issue on appeal.

17. The Harness Commission issued its Intervention Order concurrently with the First Approval Order. Thus if the First Approval Order is a final order appealable under Rule 341 of the Pennsylvania Rules of Appellate Procedure, so too is the Intervention Order. But even if the First Approval Order, as the Harness Commission argues, is not a final order, we would still have jurisdiction to hear the appeal of the Intervention Order under Rule 313 of the Pennsylvania Rules of Appellate Procedure (collateral orders). *See In re Barnes Found.*, 582 Pa. 370, 871 A.2d 792 (2005); *Adams v. Dep't of Health*, 967 A.2d 1082 (Pa.Cmwlth.2009).

in denying Philadelphia Park's request to participate as a party intervenor. To right the wrong,[18] not only must we reverse the Intervention Order, we must vacate the First Approval Order and the Second Approval Order and remand this matter for further proceedings. *See MEC; Sheetz I.* As a result, we will not address Harrah's Chester's request that we dismiss the appeal of the First Approval Order for lack of standing. We will dismiss as moot Philadelphia Park's appeals of the First Approval Order and Second Approval Order. And, consequently, we will deny the applications for reconsideration of our January 14, 2011 Order and the Harness Commission's application to quash.

## III. CONCLUSION

Based on our review of the Harness Commission's Intervention Order, the parties' arguments, Philadelphia Park's intervention papers, and Harrah's Chester's response thereto, it is clear to the Court that the Harness Commission misapplied the law. Moreover, its conclusion that Philadelphia Park's intervention papers lack any showing that Philadelphia Park was eligible to intervene is based on so narrow of a reading of the intervention papers that we must conclude that the decision is clearly unreasonable. For those reasons, we conclude that the Harness Commission abused its discretion in denying the intervention petition.

It is clear to the Court that Philadelphia Park was eligible to intervene in the proceeding below on Harrah's Chester's application for approval of its AWS. And, while a person's *eligibility* to intervene in a proceeding before an administrative agency does not necessarily require the agency to

grant intervention, the Harness Commission's conclusion that Philadelphia Park did not meet the eligibility requirements was the only reason it provided in the Intervention Order to support its denial of Philadelphia Park's intervention petition. We, therefore, reverse the Harness Commission's Intervention Order and Vacate the First Approval Order and Second Approval Order. This matter is remanded for a formal hearing and adjudication in accordance with the AAL.

### *ORDER*

AND NOW, this 21st day of March, 2011, the May 27, 2010 Order of Respondent Pennsylvania State Harness Racing Commission denying Petitioner's Petition to Intervene is REVERSED. As a result, Respondents' May 27, 2010 Order and September 30, 2010 Order (Merits Orders), addressing the merits of Intervenor Chester Downs and Marina, LLC d/b/a Harrah's Chester Casino & Racetrack's petition for approval of telephone account wagering are VACATED.

The appeals of the Merits Orders are DISMISSED as moot. The applications seeking reconsideration of our January 14, 2011 Order (No. 2710 C.D. 2010) are DENIED. The applications to quash the appeal docketed at No. 2710 C.D. 2010 are DENIED as moot.

This matter is REMANDED to the Pennsylvania State Harness Racing Commission for a formal hearing and adjudication in accordance with the AAL.

Jurisdiction relinquished.

---

**18.** Section 706 of the Judicial Code, 42 Pa. C.S. § 706, provides:

An appellate court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and may re-

mand the matter and direct the entry of such appropriate order, or require such further proceedings to be had as may be just under the circumstances.