**SHAWNEE TABERNACLE CHURCH, Petitioner**

**v.**

**PENNSYLVANIA STATE ETHICS COMMISSION, Respondent.**

**Dennis Bloom, Petitioner**

**v.**

**Pennsylvania State Ethics Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Feb. 12, 2013.

Decided Sept. 24, 2013.

Rhonda M. Anderson and George Gossett, Jr., Philadelphia, for petitioner Shawnee Tabernacle Church.

Marshall E. Anders, Stroudsburg, for petitioner Dennis Bloom.

Brian D. Jacisin, Assistant Counsel, for respondent.

BEFORE: BROBSON, Judge, McCULLOUGH, Judge, and COVEY, Judge.

OPINION BY Judge BROBSON.[1]

Shawnee Tabernacle Church (Church) and Dennis Bloom (Bloom) (collectively, Petitioners) petition for review of the May 11, 2012 order of the Pennsylvania State Ethics Commission (Commission). In that order, the Commission denied the Church's petition to intervene in an administrative proceeding initiated by the Commission against Bloom under the Public Official and Employee Ethics Act, 65 Pa. C.S. §§ 1101–1113 (Ethics Act). Because the Commission did not abuse its discretion, we affirm the Commission's order.

## BACKGROUND

### A. Commission Proceeding

On or about November 10, 2010, the Pocono Mountain School District (School District) filed a formal complaint with the Commission. (Reproduced Record (R.R.) 4a–10a.) In its complaint, the School District contended that Bloom, in his capacity as Chief Executive Officer (CEO) of the Pocono Mountain Charter School (Charter School), violated the Ethics Act. The School District contended that Bloom engaged in a series of self-dealing and conflicts of interest stemming from his role as CEO of the Charter School and his simultaneous role as Senior Pastor of the Church, which happens to be the Charter

School's landlord. More specifically, the School District alleged the following:

[D]uring his tenure as Senior Pastor of the Landlord–Church and CEO of the Tenant–Charter School, [Bloom] authorized over $900,000.00 in public taxpayer funds, to be spent on installing a parking lot on the church-owned land, as well as installing an elevator, gymnasium floor, lockers, etc., without obtaining any offset credit against the annual rent that the Charter School pays to the Church. The Charter School pays an annual rent of $920,000.00 to its Landlord, the … Church, for use of a building that shares a common entranceway with the Church and whose exterior has a sign stating, "Shawnee Tabernacle", with the Church logo. The … Charter School spent approximately $39,000.00 to install an electronic message board that contained the name "Shawnee Tabernacle Church" in the most prominent location of the sign, and [the] Charter School continues to promote the Church to run messages on the sign, with no charge, pursuant to an unwritten agreement. [Bloom] and his wife drew salaries from the School that approximated $200,000.00 per year. [Bloom] authorized the Charter School to pay for the gymnasium floor and include the words "Shawnee Tabernacle", on said floor.

(R.R. 6a.) The School District noted in its complaint that on October 6, 2010, its Board of Directors (School Board) voted, after a hearing, to revoke the Charter School's charter based on what the School District characterized as an "entanglement that exists between the Church and the publicly-funded Charter School." The School District asked the Commission to investigate, stating:

---

1. This opinion was reassigned to the author-ing Judge on May 23, 2013.

A full blown investigation is required so that the mandates of the ... Ethics Act are upheld and so that ... Bloom is held accountable for using taxpayer monies for his own pecuniary benefit and/or for his church's benefit, at the cost of the taxpayers.

(*Id.*)

On or about February 24, 2012, the Investigative Division of the Commission (Investigative Division) filed an Investigative Complaint/Findings Report (Complaint) against Bloom. (R.R. 11a–94a.) In that Complaint, the Investigative Division notes that it received the School District's complaint and initiated a preliminary inquiry, which it concluded in 60 days. Thereafter, it determined that a full investigation was warranted. Based on that full investigation, the Investigative Division filed the Complaint.

The Investigative Division alleges that Bloom served as CEO of the Charter School from its creation in or about 2003 until December 10, 2010—*i.e.*, the period at or around which the School District raised its concerns about Bloom's conflicts of interest and sought to revoke the Charter School's charter. Bloom and his wife formed the Church on or about February 9, 1995. Since that time, Bloom has served as the Founder and Pastor of the Church. On or about June 28, 1999, according to the Complaint, the Church purchased approximately 10.5 acres of land in Monroe County, which would become the future home of the Church and the Charter School (Tobyhanna Property). Bloom incorporated the Church in 2001 by filing appropriate papers with the Pennsylvania Department of State, identifying himself as President.

Between 1999 and 2002, Bloom operated the Tobyhanna Christian Academy (TCA), a private school which ceased operations due to a lack of financial resources. At or around the same time that TCA ceased operations, Bloom began the process of creating a charter school to be operated on the Church's property. He formed another corporate entity, the Pocono Mountain Learning Academy (PMLA), which the Investigative Division alleges is the successor to TCA. The corporate purpose of the PMLA was "to provide charter school educational instruction as an alternative to public school." Bloom later amended the corporate charter to rename the entity as the Charter School.

Bloom filed an application for a charter for the Charter School with the School District, proposing a start date of August 25, 2003, and identifying the proposed location of the school as the Tobyhanna Property. The application disclosed, *inter alia*, that the Charter School would rent space from the Church and that an addition to the building on the property is under construction to accommodate the students. The School Board approved the application on February 19, 2003.

In his simultaneous capacity as CEO of the Charter School and Founder/President of the Church, Bloom participated in the process that led to the lease agreements between the Charter School and the Church. Indeed, according to the Complaint, Bloom was the point of contact on the leases for both the Charter School, as tenant, and the Church, as landlord. Bloom actively negotiated the leases for 2003, 2004, and 2005, which the Charter School's Board of Trustees approved. The Investigative Division alleges that in 2006, when the charter came up for renewal, questions were raised about Bloom's role, presumably with the Church and the Charter School. From then on, the Investigative Division alleges, Bloom concealed his involvement by having members of the Charter School Board of Trustees sign documents.

The gist of the Investigative Division's Complaint is that Bloom acted for both the Church (landlord) and the Charter School (tenant) from 2003 through 2010 with respect to lease terms and negotiations between the Church and the Charter School. During this time, the leased area increased and the amount of rent paid by the Charter School to the Church increased. In addition, according to the Complaint, in 2006, the Charter School and the Church executed a lease amendment that called for the Charter School to pay 100% of the debt service on the Church's mortgage loan of $2.2 million, incurred from the development and expansion of the facilities on the Tobyhanna Property (Expansion Project).

The Investigative Division also details allegations relating to how Bloom, by using his official capacities with the Church and the Charter School, personally profited from the operations of the Church and the Charter School. Bloom, as CEO of the Charter School, directed the Charter School's business manager to make rent and expense payments to the Church, which were deposited into a business checking account at First National Bank of Palmerton. Bloom and his wife both had signature authority on that account. According to the Complaint, without those lease and expense payments, the Church had difficulty maintaining a positive balance in that checking account. In addition, Bloom, in his capacity as Pastor of the Church, either made payments to himself or directed Church staff to make payments to him out of that same checking account. Indeed, the Investigative Division alleges five specific instances where either on the same day or within one day of the Charter School depositing money in the bank account, a check was issued out of that account to Bloom, ranging from $12,000 to $45,000 (a total of $146,500). The Investigative Division further alleges

that while these payments were characterized as loan payments, there is no record substantiating a loan of this size by Bloom to the Church.

The Investigative Division also alleges that Bloom used his position as CEO of the Charter School to hire his son and daughter as part-time employees of the Charter School, for which the Charter School paid them $15,651.88 and $18,039.60, respectively.

With respect to the Expansion Project, the Investigative Division alleges that Bloom served as the point man for both the Church and the Charter School on the project and that he secured the financing for the project. It alleges that the financing would not have been possible if not for the lease terms that essentially had the Charter School funding the project through increased rental payments. Bloom, as President of the Church, opened a construction checking account with the lender, with himself and his wife having signature authority on the account.

The Investigative Division alleges that following the solicitation of bids for the Expansion Project in early 2007, Bloom, as Pastor of the Church, selected a company called Radium, Inc. (Radium) to serve as the general contractor. From September 2006 on, Bloom was the sole owner and operator of Radium. Bloom authorized payments from the Church's construction account to Radium and to himself personally in 2007. Though Bloom, in his capacity as CEO of the Charter School, updated the Charter School Board of Trustees on the status of the project during the latter half of 2007 and in January 2008, he never disclosed that Radium, his company, was serving as the general contractor for the project. The Investigative Division alleges that Bloom further concealed his involvement with Radium in other ways, including

in a Waiver and Release of Mechanic's lien form for Radium. The affidavit accompanying the form was signed by a Shalako Simon for Radium, who, according to the Investigative Division, was Bloom's son-in-law and had no formal position with Radium.

The Investigative Division alleges that Bloom's multiple and simultaneous positions with the Church and Radium allowed him to choose which portions of the Expansion Project would be paid from the loan proceeds or by the Charter School. Indeed, the Charter School opened its own separate construction account, with Bloom as a signatory. This account was used to pay for expenses of the Expansion Project that were not paid for through the loans taken out by the Church. Bloom, in his capacity as CEO of the Charter School, directed payments out of that construction account for such things as doors, a sign board, an elevator, the parking lot, gym flooring, and bleachers. By directing such expenses to the Charter School, Bloom, the Investigative Division alleges, freed up loan proceeds secured by the Church to be paid to Radium as the general contractor and him, as the owner of Radium, by extension.

The Investigative Division further alleges that Bloom, in his capacity as CEO of the Charter School, gave permission to his daughter to use school-leased facilities to operate her own business—The Tobyhanna Impact Athletic Center (Athletic Center). The Athletic Center, however, did not pay either the Church or the Charter School to use the facilities for its operations. The checking account for the Athletic Center identifies Bloom as one of the authorized signatories for the account. Bloom signed several checks from the account, including a November 25, 2008 check made payable to cash. That same day, Bloom made a $2,000.00 cash deposit to his personal checking account.

The Investigative Division further alleges that in 2009, Bloom, as CEO of the Charter School, directed the Charter School's business manager to issue bonus checks to Bloom and his wife, which Bloom deposited in his personal checking account. No such bonuses were authorized by the Charter School's Board of Trustees. Soon thereafter, Bloom's wife leased a 2009 Mercedes automobile for $422.63 a month with a $4,500.00 down payment. Bloom paid for the down payment from his personal checking account. Thereafter, Bloom, as CEO of the Charter School, instructed the business manager to issue monthly $450.00 payments to him as a car expense. Pursuant to this directive, the Charter School paid Bloom $4,950.00 as a car expense for the period of August 2009 through November 2010. Again, according to the Investigative Division, this expense was not authorized by the Charter School's Board of Trustees. The Investigative Division also alleges Bloom authorized vehicle lease reimbursements by the Charter School to him during the 2003–2004 school year.

Based on the foregoing, the Investigative Decision claims that Bloom, a public official/employee based on his capacity as CEO of the Charter School, violated Sections 1103(a) and (f) and 1105 of the Ethics Act. Section 1103 prohibits a public official or employee from engaging "in conduct that constitutes a conflict of interest." 65 Pa.C.S. § 1103(a). "Conflict" or "conflict of interest" is defined in the Ethics Act as follows:

Use by a public official or public employee of the authority of his office or employment or any confidential information received through his holding public office or employment for the private pecuniary benefit of himself, a member of his

immediate family or a business with which he or a member of his immediate family is associated. The term does not include an action having a de minimis economic impact or which affects to the same degree a class consisting of the general public or a subclass consisting of an industry, occupation or other group which includes the public official or public employee, a member of his immediate family or a business with which he or a member of his immediate family is associated.

*Id.* § 1102. Section 1103(f) limits self-dealing by providing:

No public official or public employee or his spouse or child or any business in which the person or his spouse or child is associated shall enter into any contract valued at $500 or more with the governmental body with which the public official or public employee is associated or any subcontract valued at $500 or more with any person who has been awarded a contract with the governmental body with which the public official or public employee is associated, unless the contract has been awarded through an open and public process, including prior public notice and subsequent public disclosure of all proposals considered and contracts awarded. In such a case, the public official or public employee shall not have any supervisory or overall responsibility for the implementation or administration of the contract. Any contract or subcontract made in violation of this subsection shall be voidable by a court of competent jurisdiction if the suit is commenced within 90 days of the making of the contract or subcontract.

*Id.* § 1103(f).

Section 1104 of the Ethics Act requires public officials to file a statement of financial interests. The Investigative Division accuses Bloom of failing to include the following required information in his statements of financial interests:

(5) The name and address of any direct or indirect source of income totaling in the aggregate $1,300 or more. However, this provision shall not be construed to require the divulgence of confidential information protected by statute or existing professional codes of ethics or common law privileges.

. . . .

(8) Any office, directorship or employment of any nature whatsoever in any business entity.

(9) Any financial interest in any legal entity engaged in business for profit.

*Id.* § 1105(b).

Pursuant to the Ethics Commission's regulations, specifically 51 Pa.Code § 21.21(a), on or about March 23, 2012, Bloom requested a formal hearing on the charges against him. (R.R. 95a.) He also filed a paragraph-by-paragraph response to the Complaint, along with additional averments under the heading of "New Matter and Affirmative Defenses." (R.R. 96a–170a.) In that document, Bloom denies every allegation of the Investigative Division material to its claim that Bloom violated the Ethics Act.

**B. Church Intervention Petition**

On April 13, 2012, the Church filed a petition to intervene in the matter before the Commission. (R.R. 171a–74a.) Excluding contentions of law, the Church alleges the following in its petition to intervene:

1. [The Church] is a Pennsylvania nonprofit corporation formed in August 2001.

2. [The Church] owns property located at 16 Carriage Lane, Tobyhanna, PA, which includes rental space leased to the Pocono Mountain Charter School.

3. [The Church] is governed by a Board of Directors, including trustees, deacons and elders.

4. As a result of an investigation of Dennis Bloom, the State Ethics Commission issued an Investigative Complaint/Findings Report on February 24, 2012.

5. In its Investigative Complaint/Findings Report, [the Church] is repeatedly named with regard to certain business transactions with Dennis Bloom and Pocono Mountain Charter School.

. . . .

8. [The Church] is extremely concerned about the ramifications of the Findings Report and subsequent action of the State Ethics Commission in this matter.

. . . .

12. [The Church] seeks to intervene to protect its interests and the interest of its members in support of Respondents' Answer to the Investigative Complaint/Findings Report . . . .

(R.R. 171a–72a.) In terms of responding to the Complaint against Bloom, the Church incorporates by reference certain paragraphs of Bloom's answer. In addition, the Church alleges the following:

[The Church], by way of further answer, avers that any reference in the Commission's Report to [Bloom's] relationship to the Church is objected to, as this is outside the scope of the Commission's authority and an impermissible intrusion by the State into Church affairs in violation of the constitutional principal of separation of Church and State.

The activities of [the Church] in leasing its property to the [Charter School] and in expanding its physical plant to accommodate the growth of the [Charter School] are activities that occurred between the [Charter School] and [the] Church, each a valid and lawful not for profit corporation each governed by a Board of Trustees and each properly run by their respective Boards and, therefore, are not the proper subject of inquiry of an investigation concerning the individual Dennis Bloom.

(R.R. 173a.)[2] Bloom filed a document with the Commission, joining in the Church's petition to intervene.

## C. Decision Denying Intervention

On May 11, 2012, the Commission issued its order, denying the Church's petition to intervene. In that order, the Commission acknowledged that the Church was not the subject of the Commission's investigation and is not a respondent in any matter pending before the Commission. The Commission noted the request to intervene, as well as Bloom's joinder therein. The Commission further acknowledged receipt of the Investigative Division's answer in opposition to the petition.

In support of its decision to deny intervention, the Commission opined, in relevant part:

The Church lacks standing and does not meet the criteria of 1 Pa.Code § 35.28 for eligibility to intervene, in that: (1) the requested intervention would not be necessary or appropriate to the administration of the Ethics Act; (2) the Church is not and would not be the subject of a Commission investigative proceeding; (3) there is no statutory right for a non-party to intervene in a Commission investigative matter; (4) there is no basis for concluding that the Church has any interest in any ongoing Commission proceeding, and any

---

2. These additional averments are similar, if not nearly identical, to paragraphs found in Bloom's answer to the Complaint under the heading "New Matter and Affirmative Defenses." (R.R. 168a.)

claimed interest would be speculative, remote and indirect; (5) the Church would not be bound by action of the Commission as to Dennis Bloom; and (6) there is no public interest that would support intervention by the Church[.]

. . . .

Commission investigative matters are strictly confidential (65 Pa.C.S. § 1108),[3] and there is no basis for allowing the Church as a non-party to intervene and/or have access to discovery in any investigative matter before the Commission; and

There is no basis for concluding that references to Dennis Bloom's relationship to the Church would constitute an impermissible intrusion by the State into Church affairs.

(R.R. 177a.)

### D. The Present Appeals

The Church thereafter filed a petition for review with this Court (docketed at No. 1082 C.D. 2012). Bloom also filed a petition for review (docketed at No. 1170 C.D. 2012). The Commission filed separate motions to quash these petitions. By separate, single-Judge opinions and orders dated September 27, 2012, the Court denied the Commission's motions.[4] The Commission filed a petition for reconsideration, which the Court, again acting through a single judge, denied. Subsequently, by order dated October 2, 2012, this Court consolidated the petitions for review for disposition.

### DISCUSSION

As the Commission points out in its brief, neither the Ethics Act nor the Commission's regulations governing its investigation and enforcement procedures[5] provide for third-party intervention in an enforcement hearing against a public official or employee accused of violating the Ethics Act. While the Commission in its

---

**3.** Section 1108(k) of the Ethics Act provides:

(k) **Confidentiality.**—As a general rule, no person shall disclose or acknowledge to any other person any information relating to a complaint, preliminary inquiry, investigation, hearing or petition for reconsideration which is before the commission. However, a person may disclose or acknowledge to another person matters held confidential in accordance with this subsection when the matters pertain to any of the following:

(1) final orders of the commission as provided in subsection (h);

(2) hearings conducted in public pursuant to subsection (g);

(3) for the purpose of seeking advice of legal counsel;

(4) filing an appeal from a commission order;

(5) communicating with the commission or its staff, in the course of a preliminary inquiry, investigation, hearing or petition for reconsideration by the commission;

(6) consulting with a law enforcement official or agency for the purpose of initiating, participating in or responding to an investigation or prosecution by the law enforcement official or agency;

(7) testifying under oath before a governmental body or a similar body of the United States of America;

(8) any information, records or proceedings relating to a complaint, preliminary inquiry, investigation, hearing or petition for reconsideration which the person is the subject of; or

(9) such other exceptions as the commission by regulation may direct.

65 Pa.C.S. § 1108(k). This provision, however, does not prohibit a complainant from disclosing the fact that the complainant filed a complaint with the Commission. *See Stilp v. Contino*, 743 F.Supp.2d 460 (M.D.Pa.2010).

**4.** In denying the motion to quash the Church's appeal, this Court, through an unreported single-judge opinion authored by Judge Patricia A. McCullough, held that the Commission's order denying intervention was a collateral order immediately appealable under Pa. R.A.P. 313(a).

**5.** 51 Pa.Code §§ 21.1–.30.

brief appears to question the wisdom of allowing intervention at all in such proceedings, it nonetheless analyzed the Church's petition to intervene below under the General Rules of Administrative Practice and Procedure (GRAPP), 1 Pa. Code §§ 35.27–.32. We, therefore, will apply the same rules in evaluating the merits of the Commission's order denying the Church's petition to intervene.[6]

██ In reviewing an agency's decision to deny intervention, we employ the following standard of review:

While an agency has considerable discretion to grant or deny a petition to intervene, such decisions remain subject to review of this Court and will be reversed where the agency's decision constitutes an error of law or an abuse of discretion. An agency's decision on intervention will not be disturbed absent a manifest abuse of discretion. An abuse of discretion is not merely an error in judgment. Rather, discretion is abused where the law is overridden or misapplied, or the judgment exercised is clearly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record.

*Bensalem Racing Ass'n v. Pa. State Harness Racing Comm'n,* 19 A.3d 549, 554 (Pa.Cmwlth.2011) (en banc) (citations omitted).

██ Under GRAPP, request to intervene is by petition, 1 Pa.Code § 35.27(2), which must be in the following form:

Petitions to intervene shall set out clearly and concisely the facts from which the nature of the alleged right or interest of the petitioner can be determined, the grounds of the proposed intervention, and the position of the petitioner in the proceeding, so as fully and completely to advise the parties and the agency as to the specific issues of fact or law to be raised or controverted, by admitting, denying or otherwise answering, specifically and in detail, each material allegation of fact or law asserted in the proceeding, and citing by appropriate reference the statutory provisions or other authority relied on.

*Id.* § 35.29. With respect to who is eligible to intervene, Section 35.28 of GRAPP provides:

(a) *Persons.* A petition to intervene may be filed by a person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the statute under which the proceeding is brought. The right or interest may be one of the following:

(1) A right conferred by statute of the United States or of this Commonwealth.

(2) An interest which may be directly affected and which is not adequately represented by existing parties, and as to which petitioners may be bound by the action of the agency in the proceeding. The following may have an interest: consumers, customers or other patrons served by the

---

**6.** In so doing, we do not rule on the broader question, which the Commission touches on in its brief, of whether third-party intervention is available or appropriate generally in enforcement hearings against public officials under the Ethics Act. *See G.L. v. State Ethics Comm'n,* 17 A.3d 445, 448 (Pa.Cmwlth.) ("The GRAPP defines the general rules of practice and procedure before Common-

wealth agencies, except where an applicable statute provides inconsistent rules or an agency promulgates regulations setting forth rules that are inconsistent with the GRAPP."), *appeal denied,* 613 Pa. 648, 32 A.3d 1279 (2011). In light of the Commission's use of GRAPP's intervention rules below, that question is not before us in this appeal.

applicant or respondent; holders of securities of the applicant or respondent; employes of the applicant or respondent; competitors of the applicant or respondent.

(3) Other interest of such nature that participation of the petitioner may be in the public interest.

(b) *Commonwealth.* The Commonwealth or an officer or agency thereof may intervene as of right in a proceeding subject to this part.

*Id.* § 35.28. While Section 35.28 establishes criteria for a third party's *eligibility* to intervene in a proceeding before an administrative agency, that section does not *require* the agency to grant intervention. *Pa. Dental Ass'n v. Ins. Dep't,* 122 Pa. Cmwlth. 241, 551 A.2d 1148, 1151 (1988); *see also Keystone Redevelopment Partners, LLC v. Pa. Gaming Control Bd.,* 5 A.3d 448, 460–61 (Pa.Cmwlth.2010) ("[E]ven if [petitioner] satisfied all the criteria set forth in the regulation, the Board would not be compelled to permit intervention. Rather, the Board's decision on intervention is an exercise of discretion, the review of which is deferential."). Instead, the agency may exercise its discretion to deny intervention even if the eligibility criteria of Section 35.28 are satisfied.

Bloom filed a brief in support of his appeal, in which the Church joined pursuant to Rule 2137 of the Pennsylvania Rules of Appellate Procedure. In support of the appeal, Bloom highlights the Church's property interest in the Tobyhanna Property and its concern about how the proceeding before the Commission against Bloom might affect the lease between the Charter School and the Church. The entirety of Bloom's argument is as follows:

As previously set forth, the investigation by the . . . Commission in this case focused on the dual role of Pastor Bloom as Chief Executive Officer of the Charter School and Pastor of the Church. The thrust of the Complaint was the relationship of the School and the Church because of the dual role. In the Investigative Complaint, the Church is referenced in 79 averments or thirty-seven (37%) percent of the Commission's Investigative Findings (R.R. pp. 11a–94a).

It is the position of the Commission in the Investigative Complaint that because of the improper relationship, the School is paying too much in rent for the Lease of the School facilities and there were improprieties in the construction of the expansion of the School facilities by the Church and the monies expended therefor.

The Church, in order to pay for the construction of the expansion and pay off the mortgage for the construction of the initial phase of the School, borrowed funds using the Church property as collateral. These funds totaling $3,900,000 were borrowed from Sovereign Bank. Without the money from the rent being paid by the School, the Church would be unable to make the mortgage payment resulting in the loss of the Church property and, therefore, the School (R.R. p. 186a).

As was previously set forth, it was counsel for the Pocono Mountain School District that filed the Complaint instituting the proceedings against Pastor Bloom. This action was taken after the School Board decision to revoke the Charter was overturned by the Charter School Appeal Board. As part of the revocation proceedings, which the School District is attempting to have reopened, the School District attempted to attack the validity of the Lease contending that it is overbearing and fraudulent.

*From the Investigative Complaint, it is clear that the commission is attempt-*

*ing to have the Lease declared invalid.* If it is declared invalid, no rental payments will be forthcoming from the School, since the School District will cease funding the Charter School (R.R. p. 93a). Without these payments, the Church will be unable to pay the mortgage and the Church will lose its property (R.R. p. 186a.)

Such being the case, the Church has an interest that is a property right which will be directly affected by a decision of the Ethics Commission. It is submitted this interest is direct and substantive, since it involves a constitutionally protected right. The affect would also be immediate, *since if the Lease is declared invalid,* the School District can simply refuse to fund it. If the church is not allowed to intervene, it would have no redress in the form of an appeal to contest such a determination, even though it would be aggrieved by such a determination. Rather, the Church would be in a position of sitting hopelessly while suffering the due consequence of losing its property, since it would not be able to defend itself.

Nor, as Judge McCullough determined in her ruling on the Commission's Motion to Quash, is there any existing party who would adequately represent the Church's interest. There is no requirement that Pastor Bloom call witnesses to protect the Church's interest. Given the nature of the proceeding, Pastor Bloom and his counsel are concerned with his defense which is not necessarily the same as the Church. Thus, this prong exists.

(Bloom Br. at 11–13 (emphasis added).) For these reasons, Bloom concludes by claiming that the Commission abused its discretion and committed an error of law in denying the Church's petition to intervene.

Based on the foreging argument, it appears to the Court that the Church is claiming eligibility to intervene only under Section 35.28(a)(2) of GRAPP— "[a]n interest which may be directly affected and which is not adequately represented by existing parties, and as to which petitioners may be bound by the action of the agency in the proceeding." As we noted in *Bensalem Racing,* to satisfy this threshold eligibility test, the person seeking intervention must establish an interest that *may be* directly affected:

> It is ... not necessary for an entity seeking intervention in an administrative proceeding to show that it *is* suffering present "harm" or *will* definitively suffer harm in the future ... because actual harm, if any, can only be determined after the agency issues its adjudication.

*Bensalem Racing Ass'n,* 19 A.3d at 556 (emphasis in original). The petitioner then, as the rule provides, must establish that its interest is not adequately represented by an existing party and that the petitioner may be bound by an adverse agency action in that proceeding.

As noted above, we will review the Commission's decision in this matter to determine whether it can be set aside for an abuse of discretion. Bloom's first point in his brief is that the Church is referenced in 79 averments, or in 37%, of the factual findings set forth in the Complaint. He argues that "the thrust" of the Complaint is the relationship between the Church and Charter School because of the positions of leadership that Bloom held simultaneously in both entities.

In its order denying intervention, the Commission expressly finds, however, that "the Church is not and would not be the subject of a Commission investigative proceeding." Based on our review of the Complaint, the Church is clearly referenced throughout the document. But we

disagree with the Church's characterization, which is at odds with the Commission's finding, that the "thrust" of the Complaint is the relationship between the Church and the Charter School. To the contrary, the Complaint is, in essence, a charging document against Bloom in his capacity as a public official—*i.e.*, the CEO of the Charter School. Bloom is accused of violating the Ethics Act's conflict of interest and self-dealing limitations. The Church, by contrast, is not accused in the Complaint of violating *any* laws. While the Church is referenced throughout the document, it is referenced because, according to the Investigative Division, Bloom used his position as a leader of the Church to line his own pockets, and those of his family members, with public dollars in violation of the Ethics Act. In short, the Church is part of the story, but it is not the subject of the story. This argument, therefore, fails to persuade us that the Commission abused its discretion.

Bloom's next arguments are based on the lease between the Church and the Charter School. He contends that the Commission, through the Complaint, is seeking to have the lease declared invalid. Because the Church has an undeniable interest in the lease, Bloom contends that the Commission abused its discretion in refusing intervention. We reject this argument.

As noted above, the petition to intervene must "set out clearly and concisely the facts from which the nature of the alleged right or interest of the petitioner can be determined." 1 Pa.Code § 35.29. Simply stated, the Church did not raise its concern over its lease with the Charter School in its petition to intervene. Accordingly, we cannot say that the Commission abused its discretion in denying intervention by failing to consider an interest that was

never presented in the petition to intervene. *See Wing v. Unemployment Comp. Bd. of Review*, 496 Pa. 113, 117, 436 A.2d 179, 181 (1981) ("[T]he administrative law tribunal must be given the opportunity to correct its errors as early as possible . . . .").

But even assuming the Church had raised this specific concern in its petition to intervene, we have reviewed the Complaint and find no merit to Bloom's contention that the Investigative Division is seeking a ruling from the Commission that would declare the lease invalid. Indeed, the Commission does not even have the statutory authority under the Ethics Act to grant such relief. Section 1109 of the Ethics Act, 65 Pa.C.S. § 1109, provides for penalties. Nothing in that section empowers the Commission to void contracts. Moreover, Bloom is accused of violating, *inter alia*, Section 1103(f) of the Ethics Act. Although that provision does provide that contracts entered into in violation thereof are "voidable," they are voidable only in the context of a suit filed in a court of competent jurisdiction within 90 days of the making of the contract. *Id.* § 1103(f). The Commission is not a court, and the Complaint was filed well beyond the 90-day period.

The Church also references concerns over past and possibly concurrent efforts by the School District to revoke the Charter School's charter on the grounds that the lease between the Charter School and the Church is overbearing and fraudulent. Again, we cannot say that the Commission abused its discretion by failing to look at this asserted interest of the Church, because the Church did not allege this interest in its petition to intervene. *See* 1 Pa.Code § 35.29; *Wing*, 496 Pa. at 117, 436 A.2d at 181.[7] But even if we consider

---

7. Based on the allegations in the Complaint,

the School District took action to revoke the

it, in examining the Complaint, we do not see any allegation by the Investigative Division, let alone a request that the Commission adjudicate, that the lease between the Charter School and the Church "is overbearing and fraudulent" or otherwise commercially unreasonable, such that it can or should be voided. To the contrary, in examining the relevant allegations of misconduct of the Complaint (R.R. 12a–13a), the Investigative Division is focused not on the legality or reasonableness of the lease terms, but rather on how Bloom (allegedly) personally benefitted from the

Charter School's charter on October 6, 2010, following 15 hearings on the matter, concluding that the Charter School operated in violation of the Charter School Law, Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. §§ 17–1701–A to –1751–A. On September 27, 2011, the State Charter School Appeal Board (CAB) voted to overturn that decision, after the Charter School acted quickly to address the School Board's concerns. Those actions included: (a) accepting the resignation of Bloom as the Charter School's CEO, effective December 10, 2010; (b) modifications to the agreements between the Charter School and the Church; and (c) removal of the Church's name from signage and the gymnasium floor. (R.R. 92a.) CAB, however, never issued a written opinion in support of its September 27, 2011 action. *See* 24 P.S. § 17–1717–A(i)(8) (requiring CAB to issue written decision within 60 days following its review).

On or about January 12, 2012, the School District requested that CAB reopen the record of the Charter School's appeal from the School District's revocation decision. In support of its request, the School District cited to an audit report issued by the Pennsylvania Auditor General, critical of the Charter School. By order dated February 28, 2012, CAB granted the request, vacated its September 27, 2011 decision in favor of the Charter School, and reopened the record to consider the audit report. On July 30, 2013, CAB voted unanimously in favor of revocation. It issued a written adjudication on August 2, 2013. *Pocono Mountain Charter Sch. v. Pocono Mountain Sch. Dist.*, Docket No. CAB 2010–06 (Aug. 2, 2013). The adjudication includes 141 separately-numbered factual findings, many of which cover subject matter set forth in the Investigative Division's Complaint below. In the adjudication, CAB concludes that the Charter School violated Section 1715–A(4) of the Charter School Law (requiring "a charter school ... be nonsectarian in all operations"), because of its "strong entanglement with ... [the] Church and its expenditure of substantial charter school

funds for the [C]hurch's benefit and that of its pastor". *Id.* at 19. CAB also concludes that the Charter School violated Section 1715–A(5) of the Charter School Law (prohibiting a charter school from providing religious instruction or displaying religious objects and symbols on school premises), "by intentionally exposing its students to religious objects and symbols during the school day." *Id.* Finally, CAB concluded that the Charter School violated both Sections 17–1715–A(4) and 1729–A(a)(3) (requiring charter schools to "meet generally accepted standards of fiscal management or audit requirements"), "because [the Charter School] disbursed funds for non-charter school purposes and failed to meet generally accepted standards of fiscal management." *Id.*

The Charter School has appealed CAB's adjudication to this Court. In an unreported single-judge opinion by the Honorable Robert Simpson, this Court stayed the charter revocation pending this Court's disposition of the Charter School's petition for review. *Pocono Mountain Charter Sch., Inc. v. Pocono Mountain Sch. Dist.*, 1308 C.D.2013 (Pa.Cmwlth., filed August 13, 2013) (Simpson, J.).

As noted above, the proceeding before the Commission in this case involving Bloom will not and cannot, as a matter of law, result in an adjudication that declares invalid the lease between the Charter School and the Church. Moreover, based on the foregoing, adjudicatory proceedings before the School Board and CAB on the subject of the Charter School's charter have outpaced the proceedings before the Commission against Bloom. To the extent the Church has a legally cognizable interest in the Charter School's charter, that interest has already been adversely affected by CAB's decision revoking the charter independent of the proceeding before the Commission. Thus, the alleged connection between the Commission proceeding below against Bloom and the status of the charter upon which the Church relies in this appeal has been severed.

lease, which he negotiated on behalf of both the Church, as landlord, and the Charter School, as tenant. To prove violations of the conflict of interest and self-dealing restrictions found in Section 1103(a) and (f) of the Act, it is not necessary that the Commission adjudicate the fairness or reasonableness of the contract in question. From our review of the Complaint, those questions are not before the Commission in this matter.

## CONCLUSION

Based on the allegations in the Church's petition to intervene below, we cannot say that the Commission abused its discretion, such that we can set aside its decision to deny the Church's intervention request. And even if we were to consider the Church's concerns, raised for the first time in its brief to this Court, that the Commission is seeking to void the Church's lease with the Charter School or to declare the terms of the lease to be commercially unreasonable, overbearing, or fraudulent, we find no support for these concerns in the Complaint itself or in the statutes conferring jurisdiction on the Commission. We, therefore, will affirm the Commission's May 11, 2012 order.[8]

## ORDER

AND NOW, this 24th day of September, 2013, the order of the Pennsylvania State Ethics Commission, dated May 11, 2012, is hereby AFFIRMED.

8. In footnote 4, the dissent raises a public policy concern involving the religious freedoms of the Church's membership. Neither Bloom nor the Church, however, raised any concerns about the religious freedoms of the Church's members to the Commission, and they do not raise such concerns in their briefs to this Court. Moreover, there is no issue in this appeal, and thus nothing in this opinion, that comes close to touching on ecclesiastical matters of the Church.

DISSENTING OPINION BY Judge McCULLOUGH.

Because Shawnee Tabernacle (Church) has clearly established that it has an interest that may be directly affected, I respectfully dissent. We cannot overlook the impact that a pastor's dual roles in a church and a charter school had upon the church, especially its being identified in a significant number of findings by the Pennsylvania State Ethics Commission (Commission) and its position as mortgagor and lessor. Under the unique facts of this case, I would conclude that the Church met the necessary requirements for intervention in the proceedings against Dennis Bloom (Bloom) before the Commission relating to his alleged violations of the Public Official and Employees Ethics Act (Ethics Act), 65 Pa.C.S. §§ 1101–1113. The Majority aptly notes that the crux of this case focuses upon the pecuniary benefit that Bloom and his family received because of his various roles as founder and Pastor of the Church and founder and Chief Executive Officer (CEO) of the Pocono Mountain Charter School (School). Contrary to the Majority, I believe that Bloom's commingling of his multiple roles, which form the basis of the alleged violations and underlie the Commission proceedings, and the Church's role as mortgagor and lessor, serve to mandate the intervention of the Church in these proceedings.[1]

1. Indeed, the Commission's investigative complaint/findings report sets forth 211 findings. (R.R. at 11a–94a.) Of these 211 findings, 71 findings, or approximately 34%, specifically reference the Church and/or officials within the Church. *Id.* For example, the Commission's report sets forth the following findings:

22. Bloom operated the Tobyhanna Christian Academy (TCA), a private school, at 16

Carriage Square from approximately 1999 to or about 2002.

   a. Due to a lack of financial resources the TCA ceased operations sometime in 2002.

   b. Dennis Bloom has continued to use the TCA in conjunction with [Shawnee Tabernacle Church] business.

   1. Payments continued to be issued from TCA accounts to Bloom and his children after the TCA ceased formal operations as a school.

23. In or about 2002 Dennis Bloom began the process of creating a charter school to be operated on property owned by the Shawnee Tabernacle Church located at 16 Carriage Square, Tobyhanna, PA.

33. From or about February 2003 until December 2010, Bloom served a dual role as CEO of the [Pocono Mountain Charter School] and Founder/President of the Shawnee Tabernacle Church [STC].

   a. This dual role included participating in the process which resulted in lease agreements being entered into between the PMCS and the Church for property located at 16 Carriage Square, Tobyhanna, PA.

. . .

35. Bloom was the point of contact on the leases for both the Shawnee Tabernacle Church (STC) and the PMCS.

. . .

37. On June 5, 2003, Dennis Bloom, in his official capacity as President of the Shawnee Tabernacle Church signed a lease agreement with the PMCS.

   a. This lease also was signed by Elder James Shelton, Board President, PMCS.

   1. James Shelton was an Elder with the Shawnee Tabernacle Church and a member of the PMCS founding group along with Bloom when he signed this lease as President of the PMCS.

   b. Dennis Bloom was the CEO of the PMCS when he signed this lease as President of the Shawnee Tabernacle Church.

. . .

39. Following renewal of the PMCS charter by the [Pocono Mountain School District or PMSD] additional leases were entered into by PMCS with the STC.

. . .

41. Terms of the leases were prepared by Attorney Henry Langsam with input from Bloom.

   a. Bloom was Langsam's point of contact on matters relating to the STC's leases with PMCS.

   b. Bloom, as CEO, was PMCS's point of contact with the STC on matters related to the leases.

. . .

51. In 2006 Bloom, as CEO, approved lease payments issued by PMCS to STC.

   a. That practice ceased sometime in 2007.

52. As the CEO of the Pocono Mountain Charter School (PMCS) Dennis Bloom directed PMCS Business Manager Loletta Robertson to make multiple rent and expense payments to the Shawnee Tabernacle Church (STC).

53. The payments made by the PMCS to the STC for the rental payments and assorted expenses were deposited into a Business Checking Account (Account No. xxx557) that the STC maintained at First National Bank of Palmerton.

   a. Dennis and Gricel Bloom had signature authority on the account.

54. Without the PMCS rental and expense payments being deposited into the Business Checking the STC maintained at the First National Bank of Palmerton, the STC had a difficult time keeping a positive balance on the account.

55. Dennis Bloom in his capacity as the Pastor of the STC either made payments to himself or directed STC subordinate staff to make payments to Dennis Bloom from the Business Checking Account (Acct. No. xxx557) that the STC maintained at the First National Bank of Palmerton.

56. Dennis Bloom had payments issued to him from the STC Business Checking Account in his capacity as the Pastor of the STC immediately after Dennis Bloom, in his capacity as the CEO for the PMCS, directed PMCS subordinate employees to make rental and expense payments to the STC.

. . .

125. At the time the PMCS was considering expansion, the PMCS had leases for space with the STC.

   a. A lease for space was entered into by PMCS with STC on or about June 5, 2003.

   b. Amendments to the leases were approved on June 25, 2004, and November 3, 2005.

126. Based on the decision to expand, which was recommended by Bloom, as PMCS CEO, amendments to the original June 5, 2003, lease were agreed upon by the PMCS and STC.

. . .

131. Dennis Bloom in his official capacity as CEO of the PMCS had supervisory responsibility over the expansion project representing both the PMCS and the STC.

   a. Bloom served as the liaison between the PMCS Board of Trustees and the STC.

   b. Bloom, as the Pastor of the Shawnee Tabernacle Church, was the primary STC representative involved in the expansion/renovation project.

132. Dennis Bloom's employment contract specifically designated him as the PMCS representative overseeing the construction/expansion project.

   a. As Pastor and President of the STC, Bloom was the church representative to secure financing for the expansion and to secure leases from the PMCS for the expansion space.

   1. Without leases from PMCS funding for the project would not be approved.

   2. Rent from PMCS was the STC's primary source of repayment of any loans.

133. Funding for the expansion project was obtained by Bloom as Pastor of the Shawnee Tabernacle Church through construction loans.

   a. These construction loans were to be repaid based on increased rental payments the PMCS would pay to the Shawnee Tabernacle Church.

134. On July 9, 2007 a Master Lease Agreement between Shawnee Tabernacle Church and Pocono Mountain Charter School was executed.

. . .

136. In or about the spring of 2007, STC, Inc., through Dennis Bloom, secured a construction loan from Sovereign Bank for the expansion/renovations of the PMCS.

   a. The loan's purpose also included refinancing of existing debt of the STC, Inc.

. . .

138. A summary of the loan terms and conditions was signed by Bloom as Pastor and President of STC on May 18, 2007.

. . .

145. Settlement of the loan occurred on July 18, 2007.

   a. All settlement documents were signed by Bloom, as Pastor/President of STC.

146. STC's primary repayment source of the loan from Sovereign was to be the cash flow from the PMCS as a result of increased rents.

   a. A repayment analysis completed by Sovereign Bank determined that in fiscal year (FY) 2005, the PMCS was responsible for 47.7% or $409,000 of the STC's revenues of $863,000. For FY 2006, the PMCS was responsible for $420,000 or 37.9% of the STC's $1,107,000 revenues.

   b. Rent revenues to the STC from the PMCS were expected to increase to $828,000 in FY 2007 due to the expansion.

   c. The STC had net profit margins as follows:

FY 2004: 49.1%
FY 2005: 65.6%
FY 2006: 43.9%
FY 2007(Q 1): 55.2%

   d. Revenues were based on rent income from PMCS.

147. On or about June 8, 2007, Dennis Bloom, as STC President, opened a construction checking account at Sovereign Bank (no. xxxxxx1928).

   a. The owner was identified as Dennis Bloom, DOB: [xx/xx/xxxx]; SSN: xxx-xx-xxxx.

   b. Business entity was listed as the STC.

   c. Secondary owner information was Gricel Bloom, DOB: [xx/xx/xxxx].

   d. Primary purpose of the account was to issue payments from the construction account.

   e. Corporate Authorization Resolution filed with Sovereign identified Dennis and Gricel Bloom as officers of STC.

   1. Dennis Bloom signed the resolution as Secretary.

   f. No other STC officials were listed as having signature authority for this account.

. . .

167. STC's loan with Sovereign Bank is currently in default status due to Bloom's refusal, as STC President, to comply with loan covenants to provide financial reports, including quarterly statements and annual audits of STC's accounts.

168. Bloom's multiple roles as CEO, Founder/Pastor, President of STC and general contractor, d/b/a Radium, Inc., allowed him to determine which expansion costs would be paid by the Sovereign Bank loan and those which would be incurred by the PMCS.

. . .

170. Funding received by the PMCS was used in part to pay for improvements made to property owned by the Shawnee Tabernacle Church at 16 Carriage Square, Tobyhanna, PA.

As the Majority states, while an agency has considerable discretion to grant or deny a petition to intervene, such decisions remain subject to review of this Court and will be reversed where the agency's decision constitutes an error of law or an abuse of discretion. *Bensalem Racing Association v. Pennsylvania State Harness Racing Commission,* 19 A.3d 549, 554 (Pa. Cmwlth.2011) (*en banc*). Additionally, we look, as did the Commission, to the General Rules of Administrative Practice and Procedure (GRAPP), 1 Pa.Code §§ 35.27–35.32, to determine if the Commission's denial of intervention was proper. Section 35.28 of GRAPP addresses a party's eligi-

a. Bloom, as CEO of the PMCS made decisions and entered into agreements relating to items bought and paid for by the PMCS which improved the value of the leased property.

. . .

206. In an effort to address the issues raised as part of the charter revocation process, the PMCS took several steps in December 2010, to address some of the issues raises.

a. These steps included in part, the resignation of Dennis Bloom as the schools [sic] CEO, and modified lease and/other agreements between the PMCS and church.

. . .

211. Bloom, members of his immediate family, and/or business with which Bloom and/or his immediate family were/are associated, realized a private pecuniary benefit of $5,109,159.12, as a result of Bloom's use of the authority of his public office as CEO of the PMCS, as follows:

a. Bloom and/or Shawnee Tabernacle Church (STC) a business with which Bloom is associated, realized a pecuniary benefit of $4,604,200.00, as a result of Bloom, as CEO of PMCS, entering into lease agreements with the STC, for rental of building space and school grounds. *See finding no. 50(b).*

b. Between 2006 and the present, Bloom and/or Radium, Inc., a business with which Bloom is associated, realized a pecuniary benefit of $265,000.00, as a result of Bloom, as CEO of PMCS, entering into agreements with the STC for the expansion of school facilities, at a time when Bloom knew or had a reasonable expectation that Radium, Inc. would be serving as the General Contractor for the construction/expansion project.

c. Bloom and/or the Tobyhanna Impact Athletic Center (TIAC), a business with which Bloom and/or his immediate family is associated, realized a pecuniary ben-efit of $8,909.95, as a result of Bloom utilizing his public position as the CEO of the PMCS, to authorize TIAC to utilize facilities and equipment without compensation to PMCS, at a time when TIAC was charging a fee for its services/program. *See finding no. 185.*

d. Bloom and/or members of Bloom's immediate family realized a total pecuniary benefit of $33,691.48 as a result of Bloom utilizing his public position as CEO of the PMCS to direct and/or approve the hiring of his daughter, Priscilla Bloom and son, Mitchell Bloom, by the PMCS. *See finding no. 121.*

e. Bloom realized a pecuniary benefit of no less than $4,950.00, when as CEO of the PMCS, Bloom directed and/or approved the payment of monthly automobile lease reimbursement to himself, without the approval of the PMCS Board of Trustees. *See finding no. 169.*

f. Bloom and/or members of Bloom's immediate family realized a total pecuniary benefit of $18,035.19 as a result of Bloom utilizing his public position as CEO of the PMCS to direct and/or approve the payment of bonuses to himself and his wife, Gricel Bloom, by the PMCS, without the approval of the PMCS Board of Trustees. *See finding no. 188.*

g. Bloom and/or members of Bloom's immediate family realized a total pecuniary benefit of $28,372.50 ($9,457.50 × 3 years) as a result of Bloom utilizing his public position as CEO of the PMCS to recommend and influence the PMCS Board of Trustees to issue a pay raise to Bloom's wife, Gricel. *See finding no. 107.*

h. Bloom realized a pecuniary benefit of no less than $146,000.00, when as CEO of the PMCS, Bloom directed the payment of lease monies to STC which then directly disbursed to Bloom via STC.

(R.R. at 11 a–94a.)

bility to intervene in agency proceedings, and provides in pertinent part as follows:

(a) *Persons.* A petition to intervene may be filed by a person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the statute under which the proceeding is brought. The right or interest may be one of the following:

(1) A right conferred by statute of the United States or of this Commonwealth.

(2) An interest *which may be directly affected* and *which is not adequately represented by existing parties,* and as to which petitioners may be bound by the action of the agency in the proceeding. The following may have an interest: consumers, customers or *other patrons* served by the applicant or respondent; *holders of securities* of the applicant or respondent; employees of the applicant or respondent; competitors of the applicant or respondent.

(3) Other interest of such nature that participation of the petitioner may be in the public interest.

1 Pa.Code § 35.28. (Emphasis added.)

The Church in this case asserts an interest that will be directly affected by the Commission's action, will not be adequately represented by Bloom, and will bind the Church in future actions. Additionally, the Church asserts that this interest was not speculative, remote, or indirect. The fact that the Commission's investigative complaint/findings report sets forth 211 findings, of which 71 findings, or approximately 34%, specifically reference the Church and/or officials within the Church, buttresses these assertions. (R.R. at 11a–94a.)

These findings appear to be an indictment against the Church as much as an indictment against Bloom. While the Commission correctly notes that it has no jurisdiction over the Church and that the Church cannot be subject to its final adjudicatory order, the resulting impact of such an order will *or may* have a direct and substantial effect on the interests of the Church which is real, not speculative, and direct.

In this regard, I find this Court's recent *en banc* decision in *Bensalem Racing Association* to be controlling in establishing the standard to be applied for intervention under GRAPP. In *Bensalem Racing Association,* we reversed a decision of the Pennsylvania Harness Racing Commission (Racing Commission) denying a petition filed by Philadelphia Park Racetrack (Philadelphia Park) to intervene in proceedings before the Commission concerning a petition filed by Harrah's Chester Casino and Racetrack (Harrah's) seeking permission to conduct telephone account wagering.

Philadelphia Park, which had previously been licensed to conduct telephone account wagering, was a competitor of Harrah's as to harness racing and pari-mutuel wagering. It sought intervention on that basis and, most significantly, as a prospective competitor of Harrah's in the area of telephone account wagering. While Philadelphia Park conceded that it did not have an exclusive right to conduct telephone account wagering, it expressed concern over the impact that a new entrant will have on that market, especially where the primary market areas of Harrah's and Philadelphia Park overlapped. Philadelphia Park asserted that the financial harm it would incur from such a competitor in the telephone account wagering market established the requisite "interest of such nature that intervention is necessary or appropriate" pursuant to section 35.28(a) of GRAPP.

In reversing the Racing Commission's denial of intervention, this Court agreed

with Philadelphia Park that it had the requisite interest and rejected Harrah's contention that Philadelphia Park's interests were "too remote and did not support claims of substantial financial interest." *Bensalem Racing Association,* 19 A.3d at 554. As we observed:

> Like section 702 of the AAL [Administrative Agency Law],[2] section 35.28(a)(2) of GRAPP provides that a person seeking intervention must have '[a]n interest which may be directly affected.' *It does not require demonstration of a 'direct, immediate and substantial' interest*—which our Supreme Court has characterized in *Citizens* [3] as the 'traditional' test for standing. It is also *not necessary* for an entity seeking intervention in an administrative proceeding *to show* that it is suffering *present 'harm' or will definitely suffer harm* in the future. This is obvious not only from the use of the words 'may be directly affected' in Section 35.28(a)(2), **but also because actual harm, if any, can only be determined after the agency issues its adjudication. It is at that point that a party or nonparty wishing to appeal the agency adjudication under Section 702 of the AAL must be prepared to show that the adjudication caused harm to the person's interests**—i.e., that the person has "standing" to appeal.

*Bensalem Racing Association,* 19 A.3d at 556 (all emphasis added). As indicated above, section 35.28(a)(2) of GRAPP only requires a party seeking intervention to have an "interest that *may be* directly affected." (Emphasis added.)

In the case *sub judice*, the Church has met this standard. For example, the record reflects that the Church undertook a substantial mortgage to fund the expansion of its facilities to accommodate the school. The Church relies exclusively on the rental payments from its lease with the School to repay this mortgage. If the School would cease operating, the Church would have no manner in which to repay the mortgage, which would result in a foreclosure action by the financing bank. Certainly, the loss of the Church and the School will have an immediate and direct effect on the Church's members, the School's employees, and its students, as well as the community as a whole in regard to the choice of a place of worship and the educational choices available for parents within a particular school district.

Moreover, although the Church does not need to demonstrate that it will definitely suffer harm in the future, only that it may, *see Bensalem Racing Association,* the effect here is not speculative. Prior to the District solicitor filing a complaint with the Commission, which initiated the proceedings at issue, the District had actually instituted and completed revocation proceedings with respect to the School's charter. This revocation was based, in substantial part, on Bloom's relationship with the Church and the leases executed by the Church and the School. Indeed, the District identified at least 27 reasons underlying the revocation of the School's charter, the most relevant as follows:

> 1. *PMCS* [4] operating its business and educational programs in such a manner as to constitute an *unconstitutional entanglement with Shawnee Tabernacle Church.*

---

**2.** 2 Pa.C.S. § 702.

**3.** *Citizens Against Gambling Subsidies, Inc. v. Pennsylvania Gaming Control Board,* 591 Pa. 312, 916 A.2d 624 (2007).

**4.** PCMS refers to the School.

2. PMCS paying an excessive salary and benefits to its Chief Executive Officer.

3. PMCS's CEO, or private institutions controlled by PMCS's CEO, deriving improper financial benefits from PMCS.

4. *PMCS paying excessive rental and fees* for its school facilities *for the direct benefit of the Shawnee Tabernacle Church.*

5. PMCS and Shawnee Tabernacle *Church* entering into a lease for school facilities which was *not an arm's length transaction, and unfairly benefited the landlord.*

6. *Violation of State Ethics Law* by employment of relatives by the Charter School and creating conflicts of interest.

7. *Failure to obtain competitive bids* for products and services where such bids are required by Pennsylvania Law.

(R.R. at 85a.) (Emphasis added.) While the District's revocation has since been reversed by the Charter School Appeal Board, the District has filed a request for additional hearings. Given this history, it is inconceivable that a negative decision from the Commission in the underlying matter would not adversely affect the School's charter and, consequently, the Church.[5]

Further, there is no guarantee that Bloom will adequately represent the Church's interests before the Commission. Although the Commission has scheduled a formal hearing for Bloom, at which time Bloom is free to call representatives of the Church as witnesses, Bloom is not required to so. Given the nature of the Commission's investigative complaint/findings report and the real and substantial interests of the Church in this matter, I would conclude that the Commission erred and/or abused its discretion in failing to permit the Church the opportunity to protect its interests before the Commission.

Most notably, the Church is expressly entitled under GRAPP to intervention as a mortgagor and lessor. The substance of Bloom's alleged violations centers upon the lease and other financial transactions negotiated, approved, and/or executed by Bloom in his dual role capacity. The Church is the mortgagor for the development and expansion of the School's facilities. As a mortgagor and a lessor, the Church has an "interest that may be directly affected." Specifically, section 35.28(a)(2) of GRAPP provides that a petition to intervene may be filed by an interested holder of securities. A mortgage is

---

5. While the Majority notes that the Charter School Appeal Board reopened the record, held additional hearings, and recently issued an adjudication revoking the School's charter, the School has appealed the adjudication to this Court and, hence, the adjudication is not yet final. As the Majority notes, in an unreported single-judge opinion by the Honorable Robert Simpson, this Court stayed the charter revocation pending this Court's disposition of the School's petition for review. *Pocono Mountain Charter School, Inc. v. Pocono Mountain School District,* 1308 C.D. 2013 (Pa. Cmwlth., filed August 13, 2013) (Simpson, J.). In this opinion, Judge Simpson further directed that the matter be listed for argument in December. Thus, contrary to the Majority, the connection between

the Commission proceeding below against Bloom and the School's charter has not been severed. In fact, similar to this dissent, Judge Simpson's opinion underscores the significant effect the closing of the School will have on the community, i.e., it will result in the transition of between 350 to 400 students to unfamiliar schools, the termination of 66 staff positions, and the loss of an educational choice for parents, for which a value cannot be quantified. Furthermore, our decision in *Bensalem Racing Association* only requires a party seeking intervention to show an interest that may be affected, and, as can be seen above, this connection to the School's charter is but one of the many interests justifying the Church's intervention in the Commission's proceedings against Bloom.

defined as a "conveyance of title to property that is given as security" or "any real-property security transaction." Black's Law Dictionary 1101–02 (9th ed. 2009). Clearly, as a mortgagor and lessor, the Church qualifies for intervention under the express provisions of GRAPP.

Additionally, section 35.28(a)(2) of GRAPP specifically identifies "consumers, customers or other patrons served by the applicant" as parties that "may have an interest" in a particular matter. "Patron" is defined as "one who gives of his means or uses his influence to help benefit an individual institution or a cause." Webster's Third New International Dictionary 1656 (1986). In making financial contributions to the Church, as well as investing their time, members of the Church would meet such a definition. A decision by the Commission against Bloom may lead to the Church's financial ruin, the scattering of its members, and the end of its existence, not to mention the closing of the School, which will result in a loss of employment for local residents and a loss of an educational institution for a significant number of local students.[6]

In sum, there is no existing party who will adequately represent the Church's interests, the Church's standing to intervene is statutorily conveyed by its position as mortgagor, and the financial harm the Church may realize in this case is at least as significant and compelling as what this Court determined to be sufficient for intervention in *Bensalem Racing Association.* Coupled with the underlying facts herein, including the Commission's 71 findings specifically referencing the Church and/or officials within the Church, Bloom's dual role as Pastor of the Church and CEO of

the School, and the complex entwinement between the Church as a property owner/mortgagor and the School as a lessee, warrants the Church's intervention before the Commission.

Accordingly, I would reverse the Commission's order denying the Church's petition to intervene.

---

**6.** Furthermore, I believe there is an overriding public interest concern with respect to the Church's intervention in this matter; namely, the religious freedom of its members as protected by the 1st and 14th Amendments to the United States Constitution and Article I, section 3 of the Pennsylvania Constitution.